AMLEY v. SAGINAW MILLING CO.

1. NEGLIGENCE— AUTOMOBILES — CONTRIBUTORY NEGLIGENCE — PER-
SONAL INJURIES.
In an action for personal injuries resulting in the death
of plaintiff's decedent, caused by defendant's automobile,
while decedent was crossing a public street, the questions
of defendant's negligence and decedent's contributory neg-
ligence could not be disposed of as questions of law where
the facts were in dispute.[1]

2. SAME—PROXIMATE CAUSE—INSTRUCTIONS.
The court properly instructed the jury that the plaintiff
must establish by a preponderance of the evidence, that
defendant was guilty of negligence that was the proximate
cause of the injuries to deceased.

3. SAME—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.
The court also properly instructed the jury that the bur-
den of proof was upon plaintiff to establish that deceased
was free from any carelessness or negligence that caused,
or contributed to cause, the injuries that he received.

Error to Bay; Tappan, J., presiding.    Submitted
January 16, 1917.    (Docket No. 166.)    Decided March
29, 1917.

Case by Joseph Amley, special administrator of the
estate of Joseph Amley, deceased, against the Sagi-
naw Milling Company under the survival act for dam-
ages for injuries resulting in the death of plaintiff's
decedent.    Judgment for plaintiff.    Defendant brings
error.    Affirmed.

---

[1]On reciprocal duty of operator of automobile and pedestrian
to use care, see note in 38 L. R. A. (N. S.) 487; 42 L. R. A.
(N. S.) 1178; 51 L. R. A. (N. S.) 990.
    On the duty of pedestrian to look out for automobile, see notes
in 3 L. R. A. (N. S.) 345; 20 L. R. A. (N. S.) 232; 38 L. R. A.
(N. S.) 488; 42 L. R. A. (N. S.) 1179.
    On burden of proof as to contributory negligence, see note in
33 L. R. A. (N. S.) 1085.

*E. L. Beach,* for appellant.

*Coumans & Gaffney,* for appellee.

STONE, J.   This suit was brought under the survival
act (3 Comp. Laws, § 10117 [3 Comp. Laws 1915, §
12383]) to recover damages for injuries received by
Joseph Amley, on August 20, 1915, at Linwood, Mich.,
and resulting in his death two weeks afterwards.
Plaintiff is administrator of decedent's estate.   The
deceased would have been 71 years old had he lived
until April 7, 1916.   He had lived in Linwood a num-
ber of years, was a blacksmith by trade, owned a black-
smith shop, and worked up to the time of his injury.
His hearing, eyesight, and health were good for a
man of his age, and he was possessed of all his mental
faculties.

On the day upon which plaintiff's decedent was in-
jured, one William Miller, an employee of defendant,
was at the village of Linwood, engaged in behalf of
his employer in the purchase of hay.   Between eleven
and twelve o'clock in the forenoon Miller drove to the
village in a Ford automobile furnished by defendant.
There was but one street in the village.   It was a
county stone road running east and west.   The road
was about 66 feet wide, and there were sidewalks on
the north and south sides of the road, but there were
no crosswalks.   The distance between the sidewalks
was from 47 to 48 feet.   On the day in question, upon
arriving at Linwood, Miller drove the automobile to
the Harris store on the south side of the road, and
left the machine standing facing east, and he and his
companion, another employee of defendant, walked
across the road to the Rosebush Hotel on the north
side of the road.   The door of the store in front of
which the machine was standing was 30 to 40 feet
east of the door of the hotel.   To go from the store
to the hotel, one would go in a northwesterly direc-

tion. After being at the hotel 10 or 15 minutes, Miller and his companion crossed the road to the machine, and after cranking the machine, Miller, the driver, proceeded a short distance east and turned the machine north in a circle in the road and ran it in a westerly direction.

At the trial there was some conflict in the testimony of the witnesses, as to the position of the parties from the time Miller and his companion approached the car from the hotel. David Cummings, who was with deceased when he was injured, testified on behalf of plaintiff that he saw the automobile on the south side of the road facing east, as he and deceased started to cross the road, and that at this time the driver was about to get into the machine, and that the machine was standing still when deceased and Cummings started across the road, deceased going ahead, and that deceased was in the middle of the road when Miller got into the car. On his direct examination Mr. Cummings, among other things, testified:

"Mr. Amley came out of the store door. When he came out of the store door he spoke to me. * * * When I came out of the store there was a car standing in front of the store. * * * The day of the accident the weather was dry and fine.

"*Q.* Was the entire road space open to the driver on that day?

"*A.* Entire street was clear.

"*Q.* You say you saw a machine in front of the store?

"*A.* Yes, sir.

"*Q.* Did you notice the machine particularly?

"*A.* Yes, sir. Mr. Amley attracted my attention to it. I noticed the lettering on the car, 'Saginaw Milling Company.' It was printed on the door of the car; the side of the car. The car was on the south side of the street. The car was facing east. After I met Mr. Amley we crossed the street. We crossed in a kind of angle over toward the hotel. The hotel is not directly across the street from the store that we were coming from. * * *

"*Q.* To go from the door of the store to the door of the hotel you would go in a northwesterly direction?

"*A.* Yes, sir. If you made a straight line across the street from the door of the hotel to a point at right angles across the street, that point would be west from the store on the right about 30 or 40 feet. There is a scale across the street from the store. It is pretty directly north opposite the entrance of the store, pretty near direct straight across. After I met Mr. Amley and noticed this machine, I started to walk across the street on a little angle in a northwesterly direction.

"*Q.* Just describe to the jury, stand up and show where Mr. Amley stood with reference to where you were.

"*A.* Well, Mr. Amley was in this shape, and I was right opposite him here on the right, alongside of him, on the east side of him.

"*Q.* What did you do then?

"*A.* Well, the car approached right onto us, and I said to the old gentleman, 'Watch out, he'll run into us.'

"*Q.* Did you see this car when it started?

"*A.* I didn't pay any attention to it; no.

"*Q.* Was there any one in the car when you noticed it?

"*A.* There were two men in it.

"*Q.* When you first noticed it?

"*A.* When they came towards us, yes.

"*Q.* Were they facing east at that time?

"*A.* They were facing east, the car was; yes.

"*Q.* Was the car in motion?

"*A.* Not when I first noticed it.

"*Q.* When you were crossing the street was your back to this car, or was your face to it?

"*A.* Back. The car hit Mr. Amley. We had not got across the street yet when the machine hit Mr. Amley. We were about eight feet from the walk on the north side. Eight feet south of the north walk. The machine did not give us any warning.

"*Q.* Did you know it was coming west?

"*A.* Not until I turned my head; I heard the noise about 30 feet from me. The car was facing east. The driver took a circle and came back west. I called Mr. Amley's attention to watch out. The machine

was then 30 feet east of us.  It was just about on the scale.  The scale was 30 feet east of where we were. * * * I stepped to one side, and just cleared myself, and it struck him.  The machine was moving when it hit Mr. Amley.  It was coming around there with a good fast speed.  * * *

"*Q.* How close was the machine to Mr. Amley after you got done calling his attention to it?

"*A.* I don't know how close it was.  I just had my face to him; told him to watch out; and I jumped myself and cleared myself; that is all the time I had.

"*Q.* After you got done telling him, where was the machine?

"*A.* It had run into Mr. Amley.

"*Q.* Was it on him at that time you got done?

"*A.* It was just as quick as I could reverse around, the machine was onto him.  I did not hear any warning by the driver of this machine nor any noise to warn me that a machine was approaching.  I did not see the machine at any time before it hit Mr. Amley, except the once that I have described when it was 30 feet away, and the time when it was facing the other direction.  When it hit Mr. Amley it was facing west. After the machine hit Mr. Amley, I reversed right around and had him taken from under the machine. The machine was on him.  It carried him about 8 or 10 feet.

"*Q.* Did you notice if the wheels were rolling, or were the back wheels skidding along?

"*A.* They skidded; they dug a trench right in the ground."

On cross-examination this witness testified:

"We didn't both start across the street together. He (Amley) started across first.  I was behind him and overtook him.  When we stood between the sidewalk this automobile was standing right a little bit west—about the length of the machine west of the door of the store.  * * *

"*Q.* Did you see the car start up?

"*A.* No, sir.

"*Q.* When you did see the car it was turning around going towards the west?

"*A.* Yes, sir.

"*Q.* Turned around in the street, did it not?

"*A.* Yes. It was not backed up. I don't know how far deceased got into the street when these men were in the car, or when one man got in the car. Mr. Amley was pretty near middle ways of the street when I started to cross. When I saw one man get into the car, and when I looked down Mr. Amley was in the middle of the street. That would be maybe 30 feet from the car. I didn't measure it. He was going towards the hotel, angling a little towards the hotel going in a northwesterly direction, and he was 30 feet from the car in the middle of the street.

"*Q.* Now, then, you think, and your best opinion is, that he was 30 feet out in the street when you saw the man get into the car?

"*A.* I think he was.

"*Q.* And how far did you go before you met him?

"*A.* I hustled right along; he was going so slow I overtook him. I took a good sharp walk. I don't know how fast he was going. He was just going along about his business.   *   *   *

"*Q.* Whereabouts was he when you said to him to look out? Was he east of you or south of you?

"*A.* He was west of me, on the left-hand side of me, and just got even with him when the car came.

"*Q.* He was west of you, and the car was going west?

"*A.* Yes, sir.   *   *   *   I said, 'Look out for the car.'

"*Q.* Did you step to one side, or take a step going west?

"*A.* I stepped north.

"*Q.* That took you out of range of the wheel, did it not?

"*A.* Yes, sir. He was still west of me, right close together. When I said, 'Look out for the car,' I don't think he turned around and stopped. He didn't have time to turn around. When I spoke I stepped, and when I turned around the car was on top of him."

When the plaintiff rested his case the counsel for defendant moved for a directed verdict in its favor, upon the ground that under the evidence the plaintiff

had not made a case that entitled him to recover, which motion was denied.

On behalf of the defendant, Richard Quinan, the companion of Miller, testified as follows·

"We saw Mr. Amley and Mr. Cummings when we came out of the hotel. I remember particularly when we arrived at our car and got ready to get into the car. Mr. Cummings and Mr. Amley stood about 20 feet, 15 or 20 feet behind the car talking. This was west of the car. I saw no one else there on the street. They were in that part of the street where people ordinarily walk on the sidewalk. Mr. Miller cranked the car. He drove it. We turned the car around; just made an ordinary turn. The top was down. We used the traveled portion of the highway; the part we would ordinarily use in making a turn of that kind.

"*Q.* You were facing, as I understand, east, when you started your car up?

"*A.* Yes.

"*Q.* How much of a noise did the car make after you cranked it?

"*A.* Oh, it made noise; a Ford generally makes quite a lot of noise; you can hear them quite a considerable distance; as Mr. Archambeau says, a block at least, I should think. We got into the car; we were in no hurry; just got in leisurely. Mr. Miller got in first; I got in after him, and we turned around at that time, and the two gentlemen were standing back there; that is my recollection of it now. Mr. Miller drove the car, and was sitting on the left-hand side going west. When we started the car our backs were to the gentlemen standing on the sidewalk.

"*Q.* When you made the turn, and before you got the car fairly turned around going toward the west, did you see anybody?

"*A.* No, I didn't see anybody. Of course we looked before we started; I looked myself, and Mr. Miller looked. There was no one in sight, only these two gentlemen who were standing on the walk on the south side of the street and about 20 feet behind the car. We looked to see if any one was on the street before we made the turn. * * * Up to the time when we made the turn, the car was in low speed all the time.

When we made the turn the car was going 4 or 5 miles an hour. I don't think a Ford can go faster than that when it is starting. * * * When we got into the car and were turning around the first time I saw Mr. Amley, he was about 4 or 5 feet ahead of us.

"*Q.* What did the deceased do?

"*A.* Well, he appeared to get rattled, and he made no effort to get out of the way.

"*Q.* What did you do with the car so far as stopping it?

"*A.* Well, I wasn't driving·the car, but I know Mr. Miller put the brakes on right away. * * * The brake was on when the deceased was struck.

"*Q.* Which side of the auto struck him? What part of the car?

"*A.* Left-hand side and down the fender. I wasn't positive about that, but I think the fender on the left-hand side. * * * His body was lying right alongside of the left front wheel under the fender. Evidently we had pushed him 2 or 3 feet in the gravel road.

"*Q.* How far did your car run after you felt the impact?

"*A.* Oh, I should think about 3 or 4 feet. * * * The top was down so we had a full view. We saw the parties about 4 feet away, and the brakes were applied.

"*Q.* What became of Mr. Cummings, the witness who has been upon the stand here?

"*A.* He stepped forward; stepped out of the way.

"*Q.* Were both walking side by side, or one behind the other?

"*A.* Well, they were both pretty close; side by side.

"*Q.* Now, if he had kept on walking the same as Cummings had, would the car in any way have injured him?

"*A.* Not a bit. I cannot see how it would; no.

"*Q.* But it was by his stepping or backing up, when the car struck him?

"*A.* Yes; he was further away from the car than Cummings was.

"*Q.* Was he farther to the north side of the street than Cummings was?

"*A.* He was further from the car. Mr. Cummings was between him and the car. My recollection is that they were both walking along together, ordinarily like two people walk together.

"*Q.* Were the brakes applied, so far as your knowledge being in the car, as soon as these persons were seen?

"*A.* Yes, sir; absolutely, yes. Mr. Cummings kept on walking, and it didn't touch him, either side of the car."

On cross-examination this witness testified:

"I first saw Mr. Amley when he was 4 or 5 feet ahead of us. He was walking in a northwesterly direction. His side was to the east. We were coming from the east and turned round to go to the west. We turned round north, and we intended to go west.

"*Q.* And you were going west when you hit him?

"*A.* No, we were just getting turned.

"*Q.* You were going in the same direction he was, is that it?

"*A.* No; we went into him sideways; he was going north, and we were turning to go west; we were just getting turned to go west.

"*Q.* Then you would say you were not turned around?

"*A.* Not completely; no, sir.

"*Q.* And he was going north?

"*A.* North, and a little west; mostly north.

"*Q.* And you say that his back was not to the machine?

"*A.* No, sir; his back was not to the machine.

"*Q.* What do you say as to Mr. Cummings' back?

"*A.* Mr. Cummings was in the same position as Mr. Amley; sideways.

"*Q.* Neither one of their backs was to the machine?

"*A.* No, sir."

Fred C. Miller, the driver of the car, corroborated the testimony of the witness Quinan, and testified, among other things, on direct examination, as follows:

"*Q.* When you got into your car did you look to see if anybody was on the street?

"*A.* Yes, sir.

"*Q.* At that time in the traveled portion of the street?

"*A.* Yes, sir. As I cranked the machine I looked backward and saw two men standing there.·

"*Q.* Looking west on the street and looking east on the street, was the way all clear?

"*A.* Yes, sir; there was nobody at all with buggy or teams or pedestrians on the street that I remember. It is a straight street, and you can look west for a long ways.

"*Q.* Did you stop the car as soon as you could stop the car when you saw these gentlemen 3 or 4 feet away?

"*A.* I stopped it so quick as I could.

"*Q.* Was the car in low or high speed at the time when you saw them?

"*A.* Low speed."

On cross-examination this witness, among other things, testified:

"I didn't put the car in high speed before we struck Mr. Amley. The car was in low speed at the time when I turned round. The car was standing southwest when we came to a stop.

"*Q.* Yes, but when the machine was stopped it was southwest you say; you mean southeast and northwest don't you?

"*A.* No, sir.

"*Q.* You would not be going southwest?

"*A.* Well, I tried to get over to the south side; I was turning round. I was on the east side of the road as I started up, and I went around west.

"*Q.* Your idea was to get back in the middle of the road and go in a straight line west?

"*A.* That was my idea; yes, sir.

"*Q.* Now you say that you were completely turned, but that you wanted to go more to the south, and you were going southwest?

"*A.* I wasn't turned yet as I struck the man, I said.

"*Q.* You didn't change the wheel after you struck him, did you?

"*A.* Well, I stopped the machine.

"*Q.* Now, when you stopped it which way were you

facing in the seat of the machine? Which way were you looking, facing straight ahead?

"*A*. Southwest.

"*Q*. Then you had completely turned around, hadn't you?

"*A*. Not quite.

"*Q*. You told the jury that Mr. Amley was struck by the left side of your machine, is that right?

"*A*. Yes, sir.

"*Q*. And this is the side that you were sitting and driving on?

"*A*. Yes, sir.

"*Q*. You didn't watch that? You didn't have any speedometer on the machine that day?

"*A*. No, sir.

"*Q*. And you haven't a horn?

"*A*. Yes, sir; but I didn't have time to blow it."

At the close of all the testimony defendant's counsel again moved for an instructed verdict in its favor, and stated the reason to be because of the fact that the deceased was guilty of contributory negligence. This motion was denied, and exception duly taken.

From the brief of appellant we understand the position taken is that there should have been a directed verdict for the defendant upon the grounds that there was no evidence of any negligence on the part of the defendant, and that the deceased was guilty of contributory negligence. We have quoted thus extensively from the testimony on behalf of both parties to show, and we think it demonstrates, that pertinent questions of fact were involved; and we are of the opinion that the claim that defendant was guilty of no conduct constituting actionable negligence cannot be disposed of as a proposition of law. Neither can we say, as matter of law, that the deceased was guilty of contributory negligence. The trial resulted in a verdict for the plaintiff in the sum of $1,500 damages, and the case has been brought here upon writ of error.

We have examined the assignments of error relating to the alleged errors in the rulings of the trial

court in the introduction of testimony, and we are of the opinion that there was no reversible error in the rulings of the court upon that branch of the case. There were lengthy requests to charge proffered on the part of the defendant covering the entire case. They were not given in terms. We have examined the requests to charge in connection with the charge of the court as given. The charge was a very lengthy and exhaustive one, and we think covered the entire case and submitted fairly to the jury the questions involved, to wit, whether the defendant was guilty of the negligence alleged in the operation of the car, as charged in the declaration, particularly the allegations that it carelessly and negligently failed and omitted to give plaintiff's intestate reasonable warning of the approach of said automobile while plaintiff's intestate was walking upon said public highway as aforesaid; and whether it carelessly and negligently failed and omitted to use reasonable precaution to insure the safety of plaintiff's intestate while he was walking in the roadway of said highway; and whether it failed and neglected to operate said car at a rate of speed that was reasonable and proper, having regard to the traffic and use of said highway, when approaching plaintiff's intestate walking upon said highway. And the jury were instructed that the burden of proof was upon the plaintiff to establish all the elements of his cause by a preponderance of the evidence; that this proof must sustain two essential propositions:

1. The plaintiff must establish by a preponderance of the evidence the fact that the defendant company, through its agent, Mr. Miller, in charge of the car, was guilty of negligence that was the proximate cause of the injuries to the deceased.

2. That the burden of proof was also upon the plaintiff to establish, by a preponderance of the evidence, that he himself was free from any carelessness or

negligence that caused, or contributed to cause, the injuries that he received.

The statute in force at the time of the injury is familiar to the profession, and may be found in 1 Comp. Laws 1915, §§ 4817, 4818. We think that this statute has so often been construed by this court that it is only necessary to refer to some of our recent decisions; among them are *Schock* v. *Cooling,* 175 Mich. 313, 323 (141 N. W. 675), and *Tuttle* v. *Briscoe Manfg. Co.,* 190 Mich. 22 (155 N. W. 724). In both of the above-cited cases *Diamond* v. *Cowles,* 174 Fed. 571 (98 C. C. A. 417), is referred to, and the facts in that case were so similar to the facts in the instant case that the authority is very pertinent. An examination of the charge satisfies us that the case was fully and fairly presented to the jury; that the substance of defendant's requests that were appropriate was given in the charge of the court; and that upon both branches of the case it was properly and fully submitted to the jury.

There would be no profit in analyzing at length the requests to charge, and the charge of the court. We are of the opinion that there is no reversible error in the record, and that the judgment of the court below should be affirmed, and the same is affirmed.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.