BENJAMIN *v.* McGRAW.

1. APPEAL AND ERROR—DIRECTED VERDICT.
    On review of a directed verdict for defendant the Supreme Court will view the testimony in the light most favorable to plaintiff.

2. NEGLIGENCE—PEDESTRIANS—CONTRIBUTORY NEGLIGENCE — CROSSING ACCIDENT—REASONABLE CARE.
    There is no imperative rule of law requiring a pedestrian, when approaching a street crossing, to look both ways before stepping off the curb; reasonable care under the surrounding circumstances being all that is required.

3. SAME—AUTOMOBILES.
    The driver of an automobile approaching a crossing on a

On the question of reciprocal duty of operator of automobile and pedestrian to use care, see notes in 3 L. R. A. (N. S.) 345; 20 L. R. A. (N. S.) 232; 38 L. R. A. (N. S.) 488; 42 L. R. A. (N. S.) 1179; 51 L. R. A. (N. S.) 992.

city street is required to exercise such reasonable care
as the case requires.

4. SAME—EVIDENCE—QUESTION FOR JURY.
    In an action for personal injuries to a pedestrian who at-
    tempted to cross a city street at a public crossing, where
    he turned back to avoid defendant's automobile and was
    struck by it after he regained the curb, questions of negli-
    gence and contributory negligence, *held*, for the jury.

Error to Wayne; Mandell (Henry A.), J. Submit-
ted October 17, 1919. (Docket No. 79.) Decided De-
cember 22, 1919.

Case by DeWitt C. Benjamin against William E.
McGraw for personal injuries. Judgment for defend-
ant on a directed verdict. Plaintiff brings error. Re-
versed.

*Dohany & Dohany,* for appellant.

*William E. Tarsney,* for appellee.

SHARPE, J. The plaintiff sued to recover damages
for injuries sustained by him by being struck by an
automobile, driven by defendant, at the intersection
of Baldwin and Kercheval avenues in the city of De-
troit, on the 27th day of March, 1917. At the con-
clusion of plaintiff's proofs, a motion was made by
defendant's counsel for a directed verdict, which was
denied. After both parties had rested, such motion
was renewed and a verdict for defendant directed by
the trial judge for the reason that the plaintiff was
guilty of contributory negligence. A motion for a
new trial was subsequently made by plaintiff, which
was denied, and he now seeks a review of the action
of the trial court by a writ of error.

The plaintiff, accompanied by one Clarence Jack-
son, while walking on the west side of Baldwin ave-
nue, having reached the intersection above named,

started to cross Kercheval avenue from the south to the north side. The defendant was driving a car on the right side of Kercheval, toward the east. On direct examination, plaintiff testified:

"As we attempted to cross Kercheval, I stepped about two steps off the curb and glanced at the left and saw a red automobile coming, I should judge 60 or 70 feet away. It was coming east on the south side of Kercheval, approaching us.

"As I stepped down off the curb, I turned to the left to see if anything was coming and I saw the machine and I turned at once to get into the safety zone. I had stepped about four or five feet away from the southerly curb of Kercheval. I then advanced to the left, toward the west, and saw a machine coming and I turned as quickly as possible to regain the sidewalk. I stepped back to the curb, onto the grass. It was a crosswalk. I stepped to the south of the curb. I should judge I was two or three feet on the crosswalk or the curb when the automobile was slammed into my right side. I think possibly it was the bumper that struck me right here on the knee. * * * When I stepped off the southerly curb of Kercheval and saw it, I should judge it was going at the rate of 30 or 35 miles per hour. I immediately concluded to turn back and step upon the sidewalk. I did not stop and deliberate very long either. I could not say whether the automobile slackened its speed before it struck me. It went in the neighborhood of 100 to 150 feet after it struck me, before stopping. It stopped on Kercheval at least one-third of the way over from Seyburn. When it finally came to a stop it was headed west toward the direction from which it had been coming. There is a double track on Kercheval and the cars run east and west. When this automobile was going east just before the accident, it was between the south track and the south curb of Kercheval. That was where it was when I first saw it. After it stopped it was standing about in the middle of the street. In the middle of the street car tracks, headed westerly. I saw the automobile just before it hit me. The left wheel of the auto was below the curb. There was one wheel, as I can remember, that was on the curb

and the other, the hind wheel, was dragging right alongside the curb, the rear wheel of the right side was dragging right along by the side of the curb and the right front wheel was up on the curb and the two left wheels would be off from the curb. The curb is the division between the street and the grass plot, and the left wheel ran up over the curb or the right wheel. The right wheel ran up over the curb on the grass plot between the curb and the sidewalk. The left wheels were down in the street on the pavement. That is the position it was in when it hit me."

On cross-examination, he testified:

"*Q.* Just before you stepped off, just before you stepped off the curb or as you were coming to the curb did you look to the west?

"*A.* No.

"*Q.* You did?

"*A.* I don't think so.

"*Q.* You did not look to the west at all?

"*A.* Not sure whether I did or not. (Continuing.) I don't know whether Mr. Jackson did or not. We were busily engaged in conversation. We had got through talking about the house. I presume we were engaged in conversation.

"*Q.* You two gentlemen walked along on Baldwin avenue right across Kercheval?

"*A.* Yes, sir.

"*Q.* When you came to the curb line you just stepped down out into Kercheval avenue?

"*A.* Yes, sir.

"*Q.* Is that right?

"*A.* That is right.

"*Q.* You had no occasion to look to the west, your street car would not come from that direction?

"*A.* No, sir.

"*Q.* Your street car would come from the east?

"*A.* Yes, sir.

"*Q.* You had no occasion to look to the west as you stepped off the curb?

"*A.* Just as a matter of course.

"*Q.* Did you look?

"*A.* Yes, sir, that is what I did do.

"*Q.* What did you do?

"*A.* I saw a red car coming.

"*Q.* Where was the red car?

"*A.* In the street.

"*Q.* How far away from you?

"*A.* I presume it was — anything coming toward you it is hard to tell the distance of; it was just 60 to 70 feet. (Continuing.) It was about half way between the track and the curb. It kept the same position—it occupied the same position as any other vehicle generally occupies, coming in the same direction this was coming. There was just one in the machine.

"*Q.* How far had you gotten off the curb?

"*A.* About two paces, about five feet.

"*Q.* What did you do?

"*A.* Returned and went back to the sidewalk.

"*Q.* What did the automobile do?

"*A.* Jumped the curb and knocked me in the middle of Baldwin avenue.

"*Q.* Did you keep your eyes on the automobile as it approached you?

"*A.* I saw it as it was right there onto me.

"*Q.* As a matter of fact you did not see the machine until it was right on you, did you?

"*A.* It might have been pretty close to me when I saw it, it was coming pretty fast.

"*Q.* Your position—your observation of the automobile and being struck by the automobile was in the same instant?

"*A.* No, I knew the automobile was to strike me, it seemed impossible for me to move at that moment.

"*Q.* Seemed impossible to move?

"*A.* Yes, sir, coming right up on the curb—

"*Q.* You were out in the middle of the street when you saw the automobile?

"*A.* No, the street is 41 feet wide and I was about 5 feet out.

"*Q.* Isn't it true, taking your testimony, that from the curb line on Kercheval avenue to the first street car track that you come to as you go north is a distance of 13 feet?

"*A.* Yes, sir.

"*Q.* You had stepped off the curb and you had gone 5 feet of the 13?

"*A.* Yes, sir.

"*Q.* Pretty near in the center?

"*A.* Yes, sir.

"*Q.* That is the position you occupied when you first saw the automobile?

"*A.* Yes, sir.

"*Q.* What did you do?

"*A.* Turned around and went back onto the grass.

"*Q.* What next did the automobile do?

"*A.* Jumped the curb and hit me.

"*Q.* Where did it jump the curb?

"*A.* 30 to 35 feet back from the crossing.

"*Q.* Do you mean west of Baldwin avenue?

"*A.* West of Baldwin avenue.

"*Q.* How much of the car got over the curb?

"*A.* The front right wheel.   *   *   *

"*Q.* Why didn't you continue across the street?

"*A.* Caution, safety first.

"*Q.* There was no vehicle coming?

"*A.* No.

"*Q.* No vehicle coming in the other direction, coming west?

"*A.* No. (Continuing.)   I was only five feet into the 41 feet.   Traffic going east in the direction in which this automobile was traveling would be on the south side of Kercheval avenue.   That is where the automobile was.   The south side of Kercheval avenue is paved.   Thirteen feet in width.   I was out and the automobile when I first saw it was 60 or 70 feet away, was in the usual line of travel of automobiles or other automobiles going east.   I at that time was five feet out into the highway.   There was no traffic west bound.

"*Q.* Why didn't you continue across the street?

"*A.* Caution.   If it had been an ordinary vehicle we would have continued across, but we generally get away for fire apparatus."

Clarence Jackson, who was with plaintiff at the time, testified:

"As we approached Kercheval avenue we came up to the curb and stepped off about two paces, say 5 feet, at a glance I saw the machine coming and receded back to the sidewalk.   It was a fire engine or

machine, coming from the west on the south side of Kercheval. When I saw this machine coming, at first glance, it was 50 or 60 feet away.

"I have driven and ridden in automobiles many times. I have owned an automobile at least twelve years. I am able to judge the speed at which an automobile goes. This automobile was approaching at 30 or 35 miles an hour, I should say 35 miles an hour. I instantly went back to the sidewalk, to the nearest point we had just left—the nearest point to get back to public safety. We went south on the southerly curb about three feet. That was on the west side of Baldwin avenue, the spot we had just left. The moment we had been — we had not had time to turn around before the machine hit us and then there—we had stepped to the sidewalk and missed the sidewalk and took one step further away, away from the edge of the curb onto the sidewalk, and we were just going to turn around when the machine hit us. We were going to face the same way the machine was coming. We had no particular reason only expected the machine to pass by to go on its way. The machine hit us right at that point. As near as I can tell it was the fender must have hit me. The right front fender. After I was struck I was knocked 45 feet."

We have quoted from the testimony of plaintiff and his witness at length. Under the familiar rule relative to directing a verdict on the ground of contributory negligence, we must view the testimony in the light most favorable to plaintiff. From this testimony the jury could have found that the defendant was driving the car at a speed of from 30 to 35 miles per hour, that he gave no notice of his approaching the crossing, that the car was distant 60 feet when plaintiff first saw it, that he was then about 5 feet from the curb, that it was a car used by the fire department of the city.

Since this case was disposed of in the circuit, this court has had occasion to consider the relative rights

and duties of drivers and pedestrians on the streets under a somewhat similar state of facts. In *Patterson* v. *Wagner*, 204 Mich. 593, the plaintiff was killed by having been run into by an automobile at the intersection of two streets in the city of Jackson. The deceased had stepped off the curb a distance of about 5 feet when struck by defendant's car. The defense of contributory negligence was interposed. Mr. Justice STEERE, who wrote the opinion, calls attention to the fundamental rule laid down in Babbitt on Motor Vehicles (2d Ed.), § 385, that:

"Motor vehicles must be driven slowly on approaching a crossing. The test seems to be whether the driver has control of the situation, whether he is so driving that he can stop if necessary soon enough to avoid an accident."

He further says on page 599, *et seq.*:

"Relative to the mutual rights and duties of those using the highway at such points it is said in Babbitt on Motor Vehicles (2d Ed.), § 1295:

" 'At crossings on city streets the right of passage is common to all and both pedestrians and drivers of motor vehicles are bound to exercise reasonable care for their own safety and the safety of others upon the street. The footman is not required as matter of law to look both ways and listen but only to exercise such reasonable care as the case requires. Both pedestrians and drivers are required to exercise that degree of care and prudence which the conditions demand. It is impossible to formulate any more precise definition of these relative rights and duties.'

"Unlike street cars or railroad trains, which in their noisy progress are confined to the narrow line of their rail tracks, automobiles with practically equal capacity for speed can range the road in substantial silence. They can and do traverse the streets at much greater speed, with much less noise, than other highway vehicles in common use, and on the other hand can be more surely and easily controlled by those experienced in their use. The duty and responsibility of those driv-

ing them should be, and is, proportioned to the possibilities and dangers attending the use upon the public highways of such an instrumentality of travel and transportation. It is but a rational rule which emphasizes the driver's duty of special vigilance at crossing points on city streets where the right of passage is not only free and common to all, but in common and frequent use both by pedestrians and vehicles. While the duties of reasonable care for their own safety and that of others are imposed upon both pedestrian and driver, the driver's comparative personal safety in case of collision with a pedestrian is not to be overlooked in measuring his duty to exercise commensurate care for the safety of others."

The views expressed in this case seem to be in harmony with those of appellate courts in other jurisdictions. In *Baker* v. *Close*, 204 N. Y. 92 (97 N. E. 501, 38 L. R. A. [N. S.] 487), it is said:

"The rigorous rule applicable to steam railroad crossings is necessarily relaxed at the usual street crossings, and the footman is not required, as matter of law, to look both ways and listen; but only to exercise such reasonable care as the case requires, for he has the right to assume that a driver will also exercise due care and approach the crossing with his vehicle under proper control."

See, also, *Lynch* v. *Fisk Rubber Co.*, 209 Mass. 16 (95 N. E. 400).

There is no imperative rule of law requiring a pedestrian when approaching a street crossing to look both ways before stepping off the curb. He is only required to exercise such reasonable care as the surrounding circumstances require. In crowded centers where there is much traffic, the danger is greater and greater precaution must be taken to avoid collisions. The plaintiff at the time he was struck by the car was on the curb, a place which should have been to him one of safety. The defendant had no right to have his machine there. Whether he was justified in

so running it, in his effort to avoid injury to plaintiff, as claimed by him, was a question for the jury.

The plaintiff's injury may have been due to a mere accident, for which neither party was at fault. It may have been due to the negligence of the defendant. The negligence of the plaintiff himself may have been the cause of, or contributed to, his injury. These questions should have been submitted to the jury.

The judgment entered is reversed, and a new trial ordered with costs to appellant.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.