## PERKINS *v.* HOLSER.

1. EVIDENCE — DIRECT - EXAMINATION — CROSS - EXAMINATION — CREDIBILITY OF WITNESS.

   In weighing the testimony of a witness, the whole testimony, both direct and cross, should be considered together.

2. NEGLIGENCE—AUTOMOBILE — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.

   In an action for personal injuries caused to plaintiff while crossing a public street by being struck by defendant's automobile, evidence *held*, to present a question for the jury as to plaintiff's contributory negligence.

Error to Oakland; Rockwell (Kleber P.), J. Submitted January 13, 1921. (Docket No. 2.) Decided March 30, 1921.

Case by William R. Perkins against LeRoy D. Holser for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Patterson & Patterson* (*Vandeveer & Foster*, of counsel), for appellant.

*A. L. Moore,* for appellee.

STONE, J. This is an action on the case to recover damages for a personal injury of plaintiff. The plaintiff, a resident of the city of Pontiac, on June 14, 1919, received an injury as a result of being struck by an automobile owned and operated by the defendant. South Saginaw street is the main thoroughfare of said city, and runs north and south in the center thereof, and contains a double street car track. Raeburn court is a street starting on South Saginaw street, and extending eastward therefrom. It does not extend

west of South Saginaw street.  On the northeast corner of South Saginaw street and Raeburn court was a grocery store known as Kroger's.  Diagonally across the street, that is somewhat south and west from Kroger's store, was an ice cream parlor (sometimes called a fruit store in the record) belonging to one Nichols.  It appears that on the day stated, at about 10:30 o'clock in the forenoon, the plaintiff, a man 77 years old, left his home on Raeburn court, and proceeded westwardly to the Kroger grocery.  Shortly thereafter he left said grocery store and attempted to cross South Saginaw street diagonally to the Nichols' store.  It does not appear just how wide South Saginaw street is.  It does appear that it is a paved street, with a curb.  As the plaintiff left the curb on the east side of South Saginaw street he looked in both directions—north and south—and saw two automobiles coming from the north on the west side of the street, and headed south toward Detroit. He waited for these automobiles to pass before attempting to cross, and failed to observe the third automobile which was apparently following the second, which third automobile, being that of the defendant, struck him as he was leaving the westerly rail of the west or south-bound track, resulting in serious injury. It appears that when the automobile struck the plaintiff it threw him some distance ahead of the car, and again ran into him and struck him the second time. Plaintiff testified that, although he had had a cataract removed from his right eye, at the time of the injury he had good vision in his right eye, that he was alert, had good hearing, and that the day was bright and sunny.

Suit having been instituted, the negligence charged in the declaration was that defendant drove his car in excess of 15 miles per hour; that he did not drive with his car under control; that he did not sound the horn

or give a reasonable warning of his approach; that he did not drive under such control as would permit its being ·stopped in time to avoid striking pedestrians lawfully on the street, and that he had an unobstructed view of the street ahead of him, and had ample opportunity to have seen the plaintiff had he been driving with his automobile under control. The undisputed evidence was that the car, as it approached the intersection of South Saginaw street and Raeburn court, was moving at 25 miles per hour; that no alarm was sounded and that it was running at such a high rate of speed that after striking the plaintiff the car skidded, and struck plaintiff, who had been thrown ahead of the car, a second time before it was stopped.

At the close of the plaintiff's case defendant moved for a directed verdict on the ground of plaintiff's contributory negligence, which motion was denied and the case was submitted to the jury without any testimony being offered on behalf of the defendant. The verdict returned for plaintiff was in the sum of $775. There is no claim that the damages were excessive, if plaintiff was entitled to recover at all. Judgment having followed the verdict, the case is here upon writ of error, and the sole error relied upon is that plaintiff's contributory negligence, as matter of law, was so established by the record that the court should have taken the case from the jury and directed a verdict on behalf of defendant.

In the language of appellant's brief:

"It will be noted that it is the claim and contention of the defendant and appellant that under the proof the plaintiff failed to meet that burden which rested upon him of showing freedom from contributory negligence, but that, on the contrary, his testimony disclosed, as matter of law, conduct establishing negligence on his part. * * * Defendant takes the position that, notwithstanding all that plaintiff's proof established, he should not be held and bound to re-

spond in damages because the plaintiff was guilty of contributory negligence as his own testimony disclosed. There was a slight variance between the testimony given by plaintiff on direct-examination and cross-examination, but defendant maintains that plaintiff is bound by his adverse testimony, although it must be viewed in its most favorable light in passing upon the question as to whether or not plaintiff was guilty of contributory negligence."

So much depends upon the testimony of the plaintiff that we shall quote therefrom at considerable length. Plaintiff, after stating his age, and residence in Pontiac for 20 years, testified that he came to Kroger's store for some things, and as they did not have everything he wanted he started to cross the street to the ice cream parlor; that this latter place was opposite and a little south from Kroger's store; that as near as he could tell he was struck by the automobile near the west street car track; that he saw two automobiles going toward Detroit and that after they had passed he started to go to the opposite store; that before starting he looked both ways, but he did not know anything about defendant's car until it struck him. He described how he was thrown and that the car struck him a second time, and that the car when it stopped was on his hand and that the car had to be backed up before he could be removed. He described his injuries in detail; also testified that he had had a cataract removed from his right eye, and that after it had been removed, for a short time, he could see just as well out of that eye as he ever could.

Upon cross-examination he testified as follows:

"*Q.* Now, just before you were struck by the automobile you saw two cars pass going towards Detroit?

"*A.* Yes, sir.

"*Q.* Did you, before crossing, look to the north and to your right?

"*A.* Sure, I looked both ways.

"*Q.* You looked both ways?

"*A.* Yes, sir.

"I was about four feet from the curbstone when one car passed me and I stopped and another passed me. I had only a little ways to go to cross the street. I think Saginaw street from curb to curb is between 40 and 50 feet. I was walking in a southwesterly direction as I crossed the street. I can hear the steam from that radiator from a distance of about ten feet.

"*Q.* Now, when you started across Saginaw street to go over to the ice cream parlor, you reached the first street car track all right, didn't you?

"*A.* When I started to go over the second street car track—

"*Q.* Well, to get to the second street car track you had to cross the first one?

"*A.* Yes, sir.

"*Q.* And you did cross the first one?

"*A.* Yes, sir.

"*Q.* Then you crossed the space between the two street car tracks?

"*A.* I was not betwixt the two street car tracks at all, after I crossed the first I was between the street car track and the curbstone, the last curbstone on the other side where I was going.

"*Q.* You had to cross—

"*A.* I was betwixt the street car track and the curbstone, in the middle of the last street car track.

"*Q.* What was the distance between the curb, the west curb and the first rail of the south-bound track?

"*A.* What was the distance?

"*Q.* Yes.

"*A.* About eight feet from the last car iron. It was about eight feet as near as I can tell.

"*Q.* That is, from the last rail over to the curb was possibly eight feet?

"*A.* Yes, from the curbstone over to the first street car track, outside iron, not the inside, the outside iron next to the curbstone.

"*Q.* How far had you gone from the last rail towards the curb before you were struck?

"*A.* Well, I was stepping from the last iron from the street car track to get onto the curbstone when I was struck.

"*Q.* You had just left the car track and was going

towards the curb when you were struck, then, is that correct?

"*A.* No, it ain't. I told you straight. I told you I went across the street car track that is next to my place, then I went across them two and I got on the other two down about the last one and I was about the middle of the last one or pretty near a little over the middle when the car struck me on the curbstone.

"*Q.* Where were you standing watching when you last looked towards the north to see if the automobile was coming?

"*A.* I was standing awhile before the two went towards Detroit before I crossed the track, after those two had gone towards Detroit then I started to walk across the street.

"*Q.* After those two had gone towards Detroit then you started to walk across the street?

"*A.* Why, certainly, that's the only way you would do, wouldn't you?

"*Q.* You saw two automobiles, you saw them passing you going towards Detroit when you were standing still. Is that correct?

"*A.* That's what I told you. These two machines were probably three or four rods away when I first saw them.

"*Q.* How far from the north did you watch them when you first saw them?

"*A.* I couldn't tell you exactly, probably three rods. After they passed me I started across the street.

"*Q.* Now, then, after you started across the street and after they had passed you, did you look to your right again out towards the north?

"*A.* No, I couldn't because I was in a hurry to get across the street for fear any more would come. I don't think any one would do that.

"*Q.* So that you only looked once towards the north to your right and at that time you saw two going south towards Detroit?

"*A.* I told you I went down a little path from the curbstone, two or three feet. I saw two coming, going to Detroit, and I looked both ways before going across and after they passed me I didn't see any more. Then I started to go across to the store. I looked both ways.

"*Q.* When you were three or four feet from the curb, while standing waiting for automobiles to pass you, going south, after they passed you, you started across the street toward the west and did you again look to your right after that?

"*A.* I looked both ways.

"*Q.* All right, now did you look a second time?

"*A.* Yes, sir.

"*Q.* Did you look the third time?

"*A.* I don't know, sir. No, I didn't look the third time.

"*Q.* You only looked once?

"*A.* When them cars started towards Detroit I told you, sir, that I looked that way and I didn't see any one coming that way and any one coming from Detroit and then I started to cross the track.

"*Q.* And that is the only time you looked towards the right?

"*A.* Of course.

"*Q.* Well, how many feet had you gone before you were hit?

"*A.* I told you just now I went over one street car track until I got to the second and pretty near the last iron of the street car track.

"*Q.* How many feet had you gone from the place where you were standing waiting for the two cars to go to Detroit, up to the point where you were hit?

"*A.* I don't know what you mean.

"*Q.* You know where you stood?

"*A.* Yes, sir.

"*Q.* And you know where you were hit?

"*A.* Pretty nearly, I told you that.

"*Q.* Well, you know where you were hit?

"*A.* Yes, sir.

"*Q.* Well, how many feet was it between those two points?

"*A.* I should judge probably it would be about 25 or 30 feet. I was walking just as fast as I could. It was somewhere around 10 o'clock.

"*Q.* What kind of a day was it? A very sunny day?

"*A.* Yes. Quite a warm day, too.

"*Q.* Had not been raining?

"*A.* No.

"*Q.* Standing in the center of Saginaw street, how

far could you see towards the north of you if you had looked?

"*A.* How far could I see?

"*Q.* How far north of you could you see, standing in the center of Saginaw street? ·

"*A.* Towards Pontiac?

"*Q.* Yes.

"*A.* I could see from that place down pretty near the whole line.

"*Q.* The whole line?

"*A.* Yes, sir.

"*Q.* That approximately was what distance?

"*A.* Very nearly a quarter of a mile.

"*Q.* You knew the westerly or center track of Saginaw street was used by cars going to Detroit?

"*A.* Mainly.

"*Q.* Two tracks on Saginaw street?

"*A.* Yes, sir.

"*Q.* And the east tracks are used for north-bound cars, are they not?

"*A.* Well, now, I can't tell you exactly about that, I think the track I was struck on was coming to Pontiac. The automobiles coming into Pontiac are supposed to use the right-hand side of Saginaw street, and the ones going to Detroit, the west side."

The only other witness who saw the entire occurrence was Miss Marian Hyler, who was clerking in the ice cream parlor or store above described. She testified that she was standing in the doorway of the store facing towards South Saginaw street; that she saw the automobile as it was coming not less than 25 miles per hour, and that she did not hear any horn blow. She testified that the first she saw was the automobile coming and it struck the plaintiff, and, in her judgment, threw him about 30 feet; that the defendant tried to slow down and his car skidded and the plaintiff turned a somersault and the car struck him a second time; that he was hit by the left fender; that plaintiff did not get up until he was picked up and that he was partially under the wheels and the car had

to be backed before they could get the plaintiff out. She testified that she had ridden in cars and had also driven them more or less for some time; that traffic was heavy on South Saginaw street, especially upon Saturdays, as it is the main thoroughfare between Detroit and Pontiac, and that this injury occurred on Saturday; that there was heavy traffic and there was hardly a moment through the day that automobiles were not going one way or the other; also that she saw the two cars pass just before the plaintiff was struck; that she could look north on Saginaw street for a distance of several blocks; that she stood far enough out from the door so that she could see both ways; and that she noticed it coming about a block away and there was nothing that obstructed her view. We quote the following:

"*Q.* Was there anything that would obstruct Perkins' view if he had turned and looked towards the north?

"*A.* No, sir; not that I know of.

"*Q.* Nothing that would have interrupted his view of it?

"*A.* No, sir.

"*Q.* And a person crossing the street, if they had looked toward the right or towards the north as the approaching automobile came, could have seen it?

"*A.* He just waited for the other two cars to pass.

"*Q.* He did not look then?

"*A.* Not that I remember of.

"*Q.* You saw him, you say?

"*A.* Yes, sir.

"*Q.* You did not see him look?

"*A.* No, sir.

"*Q.* If he had looked he could have seen, that is true, isn't it?

"*A.* I should judge he could, I saw it.

"*Q.* Where in the street was this automobile when you first saw it? A block away?

"*A.* Somewhere near the center of the street.

"*Q.* Near the center of the street?

"*A.* Yes, sir.

"Q. On the car track or between the car track and the west curb?

"A. Between the east rail and the—between the east track and west curb near the center of the street. * * *

"Q. And the automobile continued to come south, come right along in a southerly direction?

"A. It was near towards the center of the track.

"Q. And maintained that position right up to the time it struck Perkins?

"A. Yes, sir."

There is considerable discussion in defendant's brief as to the rule that should be applied in weighing the entire testimony of the witness, both direct and cross. There is no doubt that the whole testimony of the witness should be considered together.

It is the claim of the defendant that the instant case is ruled by the case of *Tolmie* v. *Taxicab Co.*, 178 Mich. 426, and counsel quote from that case at great length in their brief. In our opinion the cases can be distinguished. In that case the plaintiff, a teamster, 32 years of age, and two companions were crossing a city street. His companions waited for a taxicab to pass, but plaintiff who saw the approaching car 15 or 20 feet away jumped ahead and was struck by the car. Plaintiff's testimony did not show that the driver was on the wrong side of the street, or that he was proceeding at excessive speed, but that the plaintiff looked twice and failed to perceive the taxicab, or to hear any warning signal, although other witnesses testified that the horn was sounded, and it was held that plaintiff was negligent, as matter of law, for failing to exercise his faculties to protect himself. It further appeared in that case that

"there was at the time no rush or confusion of travel; with two companions, the three walking abreast, he (plaintiff) being on the side next to an approaching automobile, coming on its proper side of the street, with a clear view in that direction for half a mile; that he looked in that direction and saw nothing, al-

though his companions on the side farthest away did see the car and avoided it; that under those conditions he walked right on into the path of the approaching vehicle."

As evidence that the *Tolmie Case* was considered a close one on the law of contributory negligence is the fact that three of the justices were of the opinion that the question of plaintiff's contributory negligence was for the jury. We do not think the case controlling of the instant case.

We call attention to the case of *Ottaway* v. *Gutman*, 207 Mich. 393. In that case it was held that the facts presented a case for the jury. It was an action for personal injuries caused by defendant's automobile to plaintiff, when it backed upon him and struck him as he was crossing defendant's private driveway on the sidewalk on a public street. It was held that plaintiff's testimony that he looked and did not see any automobile coming, although the day was clear, his eyesight and hearing good, and there was no obstruction in the way, presented a question of fact for the jury. In that case it was said:

"That he looked in that direction so indifferently as not to see the car coming, did not make him guilty of contributory negligence, as matter of law, nor does the improbability of his testimony produce such a result. I think the plaintiff made a case for the jury, and that the trial judge erred in directing a verdict against him."

For cases passing upon the reciprocal duties of a pedestrian and the operator of an automobile in the public streets, the following cases are pertinent: *Bouma* v. *Dubois*, 169 Mich. 422; *Amley* v. *Saginaw Milling Co.*, 195 Mich. 189; *Patterson* v. *Wagner*, 204 Mich. 593; *Benjamin* v. *McGraw*, 208 Mich. 75.

In the *Patterson Case*, Mr. Justice STEERE said:

"Relative to the mutual rights and duties of those

using the highway at such points, it is said in Babbitt on Motor Vehicles (2d Ed.), § 1295:

> " 'At crossings on city streets the right of passage is common to all and both pedestrians and drivers of motor vehicles are bound to exercise reasonable care for their own safety and the safety of others upon the street. The footman is not required, as matter of law, to look both ways and listen, but only to exercise such reasonable care as the case requires. Both pedestrians and drivers are required to exercise that degree of care and prudence which the conditions demand. It is impossible to formulate any more precise definition of these relative rights and duties.' "

We are of the opinion that the trial court did not err in refusing to direct a verdict for the defendant, and that it properly submitted the question of contributory negligence to the jury. The judgment of the circuit court is therefore affirmed.

STEERE, C. J., and MOORE, FELLOWS, BIRD, and SHARPE, JJ., concurred. BROOKE and CLARK, JJ., did not sit.