2003 WY 73

**DIRECTOR OF the OFFICE OF STATE LANDS & INVESTMENTS, Board of Land Commissioners, Petitioners,**

v.

**MERBANCO, INC., an Ohio Merchant Banking Company; Christopher A. Johnston, as a citizen of Wyoming; Christopher A. Johnston, as the natural parent and legal guardian of Ian Oliver Johnston, Paige Kanary Johnston, and Ryan Christopher Johnston; and Wyoming Education Association, a nonprofit Wyoming corporation, Respondents.**

**In the Matter of the Teton Village School Section (Section 36, T42N, R117W):**

**Merbanco, Inc., an Ohio Merchant Banking Company; Christopher A. Johnston, as a citizen of Wyoming; and Christopher A. Johnston, as the natural parent and legal guardian of Ian Oliver Johnston, Paige Kanary Johnston, and Ryan Christopher Johnston, Appellants (Plaintiffs),**

**and**

**Wyoming Education Association, a nonprofit Wyoming corporation, Appellant (Intervening Plaintiff),**

v.

**Director of the Office of State Lands & Investments, Board of Land Commissioners, and Snake River Associates, Appellees (Defendants).**

Nos. 01–261, 02–18.

Supreme Court of Wyoming.

June 6, 2003.

Rehearing Denied July 10, 2003.

Hoke MacMillan, Attorney General; Michael L. Hubbard, Deputy Attorney General; and Nancy E. Vehr, Assistant Attorney General, Representing Office of State Lands & Investments and Board of Land Commissioners.

Rosemary J. Beless, Douglas B. Cannon, and Robert A. Garda, Jr. of Fabian & Clendenin, Salt Lake City, Utah; and Katherine Mead of Mead & Mead, Jackson, Wyoming, Representing Merbanco and the Johnstons.

William P. Schwartz of Ranck, Schwartz & Day, LLC, Jackson, Wyoming; and William J. Thomson, II and Randall B. Reed of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming, Representing Snake River Associates.

Patrick E. Hacker and Gregory P. Hacker of Patrick E. Hacker, P.C., Cheyenne, Wyoming, Representing Wyoming Education Association.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Merbanco, Inc., Christopher Johnston and his children, and the Wyoming Education Association (WEA) (referred to hereinafter as "challengers") seek a declaration that the Wyoming Constitution prohibits the exchange of state school lands without public auction and, consequently, the statutes and administrative rules which authorize such exchanges are void as unconstitutional. Case No. 01–261 came to us on a petition for a writ of review, which we granted, and, in Case No. 02–18, the district court reserved constitutional questions to this Court pursuant to W.R.C.P. 52(d). We hold the constitution requires public auctions only for sales of school lands; exchanges are not sales; and, in the absence of any other constitutional prohibitions, the legislature acted within its authority in adopting the statutes and authorizing the rules challenged here.

## FACTS

[¶ 2] This case arose out of a declaratory judgment action filed by Merbanco, an Ohio Merchant Banking Company which sought to purchase certain school lands in Teton County; Mr. Johnston, a resident of Teton County and the president of Merbanco; and the Johnston children who attend public school in the county. They filed suit against the Director of the Office of State Lands & Investments and the Board of Land Commissioners (board), the governmental authorities responsible for the administration of school lands. The dispute arose when the state undertook procedures to exchange Section 36, Township 42 North, Range 117 West of the 6th Principal Meridian, Teton County, for land of equal value without a public auction. The land in question was included within those lands granted to the state upon statehood for the support of the common schools and is located near Teton Village (Teton Village school section). Merbanco also sued Snake River Associates, a Wyoming limited partnership (SRA) which owns and operates a cattle ranch surrounding the section and has historically leased it for grazing purposes. SRA proposed acquiring ownership of the Teton Village school section in exchange for other SRA lands located adjacent to Teton Village which could be used for residential and commercial development.

[¶ 3] SRA and other interested parties[1] initiated discussions with the state through

---

1. Jackson Hole Mountain Resort was the original proponent of the exchange. In addition, Teton County became actively involved in the process because of the potential impact the use of the Teton Village school section and the proposed exchange lands adjacent to Teton Village could have on the county's land use plan.

the board and its staff concerning the possible exchange. At the same time, Merbanco urged the board to initiate procedures to sell the Teton Village school section at public auction and, on June 7, 2001, offered an opening bid of $36.48 million. On June 14, 2001, the board approved pursuing the exchange with SRA consistent with its rules. Merbanco filed a petition for review on July 13, 2001, contending the decision to exchange the Teton Village school section violated the board's constitutional, statutory, administrative, and fiduciary duties. The district court granted the state's motion to dismiss the petition for review because no final agency action had occurred. On August 1, 2001, Merbanco filed a complaint for declaratory judgment and injunctive relief seeking to have the court declare the board's decision and the statutes and regulations upon which it was based unconstitutional for lack of a public auction. WEA, a nonprofit organization whose members are educators in the Wyoming public schools and parents of students who attend the public schools, intervened in support of Merbanco's position.

[¶ 4] The state moved to dismiss Merbanco's complaint claiming the court did not have subject matter jurisdiction because none of the challengers had standing and, because no final action had occurred, the matter was not ripe for consideration by the court and no justiciable controversy existed. The district court denied the state's motion, and the state filed a petition for review. While the state's petition was pending, the board voted to end the "exclusive" negotiations with SRA in favor of continued consideration of an exchange and other options, including Merbanco's proposed public auction. As a result of the board's action, the state filed a motion to dismiss in this Court contending again the matter was not ripe and no justiciable controversy existed. This Court denied the motion concluding that issues of great statewide importance had been raised and should be addressed.

[¶ 5] The district court issued an order reserving to this Court the following questions regarding the constitutionality of the statutes and regulations authorizing land exchanges:

1. Wyoming Constitution Article 18, Section 1

a. Do the land exchange provisions of Wyoming Statutes §§ 36-1-107, 36-1-110, and 36-1-111, which permit the Board of Land Commissioners ("Board") to exchange state school trust lands for private lands without public auction, violate Wyoming Constitution, Article 18, Section 1[?]

b. Do the land exchange provisions of WCWR 060-060-026 ("Chapter 26") §§ 4(f)(i) and 5 of the Board's Rules and Regulations, which provide that exchanges of state school trust lands for private lands are processed and consummated without public auction, violate Wyoming Constitution, Article 18, Section 1[?]

c. Does the Director of the Office of State Lands & Investments' (the "Director") decision and the Board's approval of his decision to pursue an exchange of State School Trust Land Section 36, Teton County, Wyoming ("Section 36") in accordance with Chapter 26, violate Wyoming Constitution, Article 18, Section 1?

2. Wyoming Constitution Article 18, Section 3

a. Do the land exchange provisions of Wyoming Statutes §§ 36-1-107, 36-1-110, and 36-1-111, which permit the Board to exchange state school trust lands for private lands without public auction, violate Wyoming Constitution, Article 18, Section 3[?]

b. Do the land exchange provisions of Chapter 26 §§ 4(f)(i) and 5 of the Board's Rules and Regulations, which provide that exchanges of state school trust lands for private lands are processed and consummated without public auction, violate Wyoming Constitution, Article 18, Section 3[?]

c. Does the Director's decision and the Board's approval of his decision to pursue an exchange of Section 36 in accordance with Chapter 26 violate Wyoming Constitution, Article 18, Section 3?

[¶ 6] The state's petition for review of the district court's denial of its motion to dismiss and the constitutional questions reserved by the district court were consolidated in this

Court for purposes of oral argument. We address both cases in this opinion.

## A. Denial of Motion to Dismiss—Subject Matter Jurisdiction

[¶ 7] Whether a court has subject matter jurisdiction is a question of law to be reviewed *de novo. Ritter v. Ritter,* 989 P.2d 109, 111 (Wyo.1999). Subject matter jurisdiction refers to " 'the power to hear and determine cases of the general class to which the proceedings in question belong.' " *Lacey v. Lacey,* 925 P.2d 237, 238 (Wyo.1996) (quoting *Fuller v. State,* 568 P.2d 900, 903 (Wyo. 1977)). The district court's subject matter jurisdiction was invoked through the Uniform Declaratory Judgments Act (Wyo. Stat. Ann. §§ 1–37–101 to –114 (LexisNexis 2001)), which allows any person "whose rights, status or other legal relations are affected by the Wyoming constitution or by a statute" to have the construction and validity of the particular provision determined and his rights, status, or other legal relations declared in a court of law. Section 1–37–103.

[¶ 8] The state objected to the district court's consideration of the declaratory judgment action primarily because the board had made no final decision on SRA's proposed land exchange or Merbanco's proposed public auction of the lands in question. Without such final decision, the state insists, no justiciable controversy exists. While conceding the court has jurisdiction pursuant to Article 5, Section 10 of the Wyoming Constitution and the Uniform Declaratory Judgments Act, the state contends such jurisdiction does not extend to advisory opinions "since binding legal determinations made in the abstract and decisions rendered without concrete factual background would be imprecise, subject to speculation, and would create rather than diminish future controversies." *Cranston v. Thomson,* 530 P.2d 726, 729 (Wyo.1975). The state argues a justiciable controversy requires the parties have " 'existing and genuine, as distinguished from theoretical, rights or interests.' " *Brimmer v. Thomson,* 521 P.2d 574, 578 (Wyo.1974) (quoting *Sorenson v. City of Bellingham,* 80 Wash.2d 547, 496 P.2d 512, 517 (1972)). The state points out the board's decision did not foreclose the possibility of a public auction, leaving the court with hypothetical facts and issues.

[¶ 9] In response, the challengers contend they object to the very process the board was pursuing which assumed the option of an exchange without a public auction was available. The record discloses this process continued over a period of almost two years before this litigation commenced. The state, SRA, and the other interested parties, including the Teton County commission, all proceeded as if the option of a land exchange without a public auction was available, and, for a time, the state conducted exclusive negotiations with the proponents of an exchange. Merbanco entered the fray in direct competition with SRA, urging the state to adopt its position that a public auction was constitutionally required.

[¶ 10] This controversy over the constitutionality of exchanges of state lands without a public auction impacts many stakeholders, including state school land lessees, the beneficiaries of the funds generated by state school lands, the legislature which adopted statutes authorizing exchanges, those members of the executive branch of state government whose responsibility it is to steward the state school lands, as well as the public at large. As inevitable growth and development increase the pressure on Wyoming state lands, the need for certainty and clarity regarding this aspect of the management of state lands grows. We conclude this is precisely the type of circumstance contemplated by the Uniform Declaratory Judgments Act, the purpose of which "is to settle and to afford relief from uncertainty and insecurity with respect to legal relations." Section 1–37–114. The act instructs that we are to liberally construe it to fulfill that purpose. *Barber v. City of Douglas,* 931 P.2d 948 (Wyo.1997); *Reiman Corporation v. City of Cheyenne,* 838 P.2d 1182 (Wyo.1992).

[¶ 11] The state's argument that we must let the board's process with regard to the Teton Village school section run its course is counter to the entire thrust of the declaratory judgments statute which was designed to enable parties to obtain judicial determinations prior to an injury rather than requiring them to wait until the damage is

done. The board itself possesses no power to resolve questions of constitutionality. *Riedel v. Anderson (Conflicting Lease Applications for Wyoming Agricultural Lease No. 1–7021)*, 972 P.2d 586, 587 (Wyo.1999). We have rejected the argument that, in the context of administrative agency action, parties must exhaust their administrative remedies before challenging the authority of the agency to act. *Rocky Mountain Oil and Gas Association v. State*, 645 P.2d 1163 (Wyo. 1982). If the relief requested "concerns the constitutionality or interpretation of a statute upon which the administrative action is, or is to be, based, the [declaratory judgment] action should be entertained." *Id.* at 1168. To force the parties to expend the time and resources to complete the board's process only to subject the final product to possible jeopardy is not sound policy. In addition, the lack of certainty concerning the viability of the exchange option may influence the nature of the final decision by the board, an equally problematic result with the potential of denying the various stakeholders the benefits they might otherwise receive.

[¶ 12] Nevertheless, the proponent of a declaratory judgment must still present a fully justiciable controversy. As we stated in *Brimmer*, 521 P.2d at 578 (quoting *Sorenson*, 496 P.2d at 517), a four-part showing is required:

"First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities[,] be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues."

[¶ 13] The state contends the challengers cannot meet the first requirement of a justiciable controversy—that they have existing and genuine rights or interests at stake. Pursuant to the substantial public interest and importance doctrine, we have found

standing where we ordinarily would not in the following instances: *Washakie County School District Number One [v. Herschler]*, 606 P.2d 310 [ (Wyo.1980) ] (constitutionality of school financing); *Memorial Hospital of Laramie County [v. Department of Revenue and Taxation of State of Wyoming]*, 770 P.2d 223 [ (Wyo. 1989) ] (tax exempt status of hospital); *State ex rel. Wyoming Association of Consulting Engineers and Land Surveyors v. Sullivan*, 798 P.2d 826 (Wyo.1990) (constitutionality of the Wyoming Professional Review Panel Act); *Board of County Commissioners of the County of Laramie v. Laramie County School District Number One*, 884 P.2d 946 (Wyo. 1994) (entitlement of school district to interest on school district funds held by county treasurer); and *Management Council of the Wyoming Legislature [v. Geringer]*, 953 P.2d 839 [ (Wyo.1998) ] (constitutional scope of governor's veto power).

*Jolley v. State Loan and Investment Board*, 2002 WY 7, ¶ 9, 38 P.3d 1073, ¶ 9 (Wyo.2002).

[¶ 14] In a similar context, we addressed standing in a challenge to the constitutionality of the public school financing statutes and stated:

Standing is a concept used to determine whether a party is sufficiently affected to insure that a justiciable controversy is presented to the court. It is a necessary and useful tool to be used by courts in ferreting out those cases which ask the courts to render advisory opinions or decide an artificial or academic controversy without there being a palpable injury to be remedied. However, it is not a rigid or dogmatic rule but one that must be applied with some view to realities as well as practicalities. Standing should not be construed

narrowly or restrictively. Further, as said in *Residents of Beverly Glen, Inc. v. City of Los Angeles,* 1973, 34 Cal.App.3d 117, 109 Cal.Rptr. 724, 727 [ (citations omitted) ]: "In recent years there has been a marked accommodation of formerly strict procedural requirements of standing to sue and even of capacity to sue where matters relating to the 'social and economic realities of the present-day organization of society' are concerned. Accordingly, we have seen a retreat from ... formalism and rigidity...."

*Washakie County School District Number One v. Herschler,* 606 P.2d 310, 317 (Wyo. 1980) (some citations omitted).

[¶ 15] In this case, the state's claim of no standing focuses on the lack of final action, and, thus, the state argues no injury has occurred. This approach fails to consider the essential nature of the challengers' interests and whether those interests are sufficient to provide standing for the various parties.

[¶ 16] As to the standing of WEA, Mr. Johnston, and the Johnston children, they claim a potential injury because the state's position authorizing exchanges without public auction will directly affect the revenue available to the permanent school fund. In *Washakie,* we held school children and their parents had a sufficient interest in the funding of public education to maintain a challenge to the constitutionality of the statutes providing for the same.

[¶ 17] Educating the youth of our state is an important function performed by our state government. Our constitution, as we shall see, plainly expresses the commitment of a free people to the value of a thorough education. The school districts and the members of school boards are charged with the responsibility of providing education to the children of Wyoming and are tangibly injured if the statutes which guide their hands disenable them from so providing. Parents are keenly concerned and suffer tangible injury if their children do not receive a proper education. The children themselves are, obviously, tangibly injured if they do not uniformly receive the best education that tax resources can provide. With these consider-

ations in mind, we hold that each of the named appellants has standing to sue under the circumstances of this case. *Id.*

[¶ 18] A similar analysis and result are appropriate when considering the standing of WEA, an organization of persons involved and interested in public education. Although we have held that the nature of the interests of school children and their parents may meet the standing requirement in matters relating to equality in funding public schools, we still must consider whether the potential impact of less funding on WEA's members and the Johnstons is sufficient to create standing. While revenues from school lands are constitutionally and statutorily dedicated to support education, those funds provide a relatively small portion of the total funds provided for public schools. No showing was made that the funding provided by the legislature for schools would be inadequate without the interest from the permanent school fund. Furthermore, given the statutory requirement that any exchange must be on a "value for value basis," Wyo. Stat. Ann. § 36-1-111(a) (LexisNexis 2001), it seems unlikely that an exchange of lands would negatively impact the funds available for the support of education in any significant amount. However, WEA argues the significance of the impact on the permanent fund is obvious because a bid of $36.48 million was to be paid upon transfer of the land. We believe evaluating the impact on the permanent fund is the appropriate approach and concur with the standing analysis employed in *Branson School District RE-82 v. Romer,* 958 F.Supp. 1501, 1509-11 (D.Colo.1997), which concluded similar plaintiffs had standing to challenge a constitutional amendment affecting the administration of the permanent school fund in Colorado.

[¶ 19] With regard to Merbanco's standing, a different problem is presented. The state had no obligation to either sell or exchange the Teton Village school section. Consequently, Merbanco had no legally recognizable right to bid on the property. Furthermore, the public auction requirement was intended to protect interests of the permanent school fund and those who would

benefit from it, not those who may seek to purchase school lands. We have consistently held that standing requires a legally protectable, tangible interest to be at stake. *Gooden v. State,* 711 P.2d 405 (Wyo.1985) (defendant had no right to plea bargain and thus no right to claim statute imposing mandatory sentence for DUI violated constitutional separation of powers); *Cremer v. State Board of Control,* 675 P.2d 250, 254 (Wyo.1984) (senior water right holder had no standing to seek abandonment of junior right); *see also Budd v. Bishop,* 543 P.2d 368 (Wyo.1975); *Cuthbertson v. Union Pacific Coal Co.,* 50 Wyo. 441, 62 P.2d 311 (1936). Merbanco had no legally protected interest entitling it to bid on school lands and thus had no standing to challenge the statutes allowing the state to exchange lands without public auction.

[¶ 20] The Colorado Supreme Court faced a similar situation in *Brotman v. East Lake Creek Ranch, L.L.P.,* 31 P.3d 886 (Colo.2001), where a former lessee of school lands challenged a proposed exchange between the state and a third party, claiming the exchange constituted a sale and the state had not followed the statutory requirements for a sale. Colorado's test for standing is similar to ours: "A plaintiff has standing if he or she (1) incurred an injury-in-fact (2) to a legally protected interest, as contemplated by statutory or constitutional provisions." 31 P.3d at 890; *see also Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535, 539 (1977). The lessee claimed he was injured because of the potential that, if the school lands were owned privately, the lessee would be subject to condemnation for a right of way across his lands to the private section. The Colorado court found such "injury" was speculative and, even if it occurred, the lessee would not have a legally protected right to prevent a condemnation if just compensation were paid. *Brotman,* 31 P.3d at 891. Our conclusion regarding Merbanco's lack of standing is consistent with the Colorado court's reasoning.

[¶ 21] Having found three of the four challengers have standing, we must determine whether the controversy at issue is one upon which a judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical, or academic conclusion and upon which a judicial determination will have the effect of a final judgment. The state complains the lack of final action by the state renders the argument hypothetical. As stated above, we have consistently refused to require final agency action as a condition precedent to a declaratory judgment action concerning the underlying authority of the agency to act, especially when matters of constitutionality are at issue. *Wyoming Community College Commission v. Casper Community College District, State of Wyoming,* 2001 WY 86, 31 P.3d 1242 (Wyo.2001); *Rocky Mountain Oil and Gas Association,* 645 P.2d 1163. Certainly, a judicial determination of the constitutional propriety of exchanges of state lands without a public auction will provide clear rules for the future administration of state lands.

[¶ 22] Finally, the state steadfastly clings to its claim that, without final action, no adversity of interests exists. Even a cursory review of this record discloses clear adversity between the parties the state claiming it has authority to pursue exclusive negotiations for the exchange of lands with one party and the challengers demanding the immediate initiation of public auction proceedings. To require the parties to wrestle this dispute to the ground and obtain a final state action would accomplish little other than the expenditure of additional time and resources potentially in vain.

[¶ 23] Even though we conclude the traditional elements of a justiciable controversy exist in this case, we have historically relaxed those requirements in matters of great public interest and importance. *Management Council of Wyoming Legislature v. Geringer,* 953 P.2d 839, 841 (Wyo.1998); *Memorial Hospital of Laramie County v. Department of Revenue and Taxation of State of Wyoming,* 770 P.2d 223 (Wyo.1989); *Brimmer,* 521 P.2d 574. In this case, we face important questions of great public interest, and they deserve to be answered. We find the district court's denial of the state's motion to dismiss was well founded and affirm.

**B. Does the Constitutional Requirement for Public Auctions Apply to Exchanges?**

[¶ 24] The reservation lists three separate questions, each arising under Article 18,

Sections 1 and 3 of the Wyoming Constitution. Although presented as a series of discrete parts, the question is really singular: Whether the exchange of school lands without public auction violates Article 18, Sections 1 and 3 of the Wyoming Constitution.

[¶ 25] In 1890, Wyoming adopted a constitution which accepted the lands granted to it for "educational purposes," "with the conditions and limitations that may be imposed by the act or acts of congress," and required that all such lands granted to it could be "*disposed* of only at public auction." Wyo. Const. art. 18, § 1 (emphasis added).

[¶ 26] Article 18, Section 1 of the Wyoming Constitution provides in relevant part:

> The State of Wyoming hereby agrees to accept the grants of lands heretofore made, or that may hereafter be made by the United States to the state, for educational purposes ... with the conditions and limitations that may be imposed by the act or acts of congress making such grants or donations. Such lands shall be disposed of only at public auction to the highest responsible bidder, after having been duly appraised by the land commissioners, at not less than three-fourths the appraised value thereof, and for not less than $10 per acre....

In addition, Article 7, Section 13 (emphasis added) of the original constitution provided "the *sale* of all [school] lands shall be at public auction ... at such minimum prices (not less than the minimum fixed by congress) as to realize the largest possible proceeds." That section also established a board to manage the lands granted for school purposes. The original constitution also established a different board in Article 18, Section 3 for the "direction, control, disposition and care" of all lands granted to the state. However, that section did not restrict the manner of disposal or sale of such lands. Likewise, Article 18, Section 3 as amended in 1921 provides for the establishment of a board of land commissioners serving "under direction of the legislature as limited by this constitution" which

shall have direction, control, leasing and disposal of lands of the state granted, or which may be hereafter granted for the support and benefit of public schools, subject to the further limitations that the sale of all lands shall be at public auction, after such delay (not less than the time fixed by congress) in portions at proper intervals of time, and at such minimum prices (not less than the minimum fixed by congress) as to realize the largest possible proceeds.

After adoption of the Wyoming Constitution, Congress passed the Act of Admission of the State of Wyoming, 26 Stat. at Large 222, ch. 664 (1890), admitting the State of Wyoming into the Union and granting to it Sections 16 and 36 of every township in Wyoming, including the Teton Village school section, for the support of the common schools with the condition that these sections "be disposed of only at public sale."[2]

[¶ 27] Pursuant to this grant, Wyoming received 3,543,820.62 acres of land for the purpose of supporting its public schools. *See* Office of State Lands and Investments Annual Report at 25 (2001). In 1921, the constitution was amended to combine the two land boards into a single "board of land commissioners." With that amendment, the public auction requirement of Article 7, Section 13 was imported into a new Article 18, Section 3 and broadened to apply to "the sale of all lands" rather than just to "school lands" as provided in the original constitution. The amendment resulted in the two sections of Article 18 utilizing different language for the imposition of the public auction Section 1 referring to disposal and Section 3 referring to sales.

[¶ 28] The challengers' argument rests on a simple proposition: The Wyoming Constitution requires a public auction for all "sales" and "disposals" of state lands, and an exchange is a form of sale or disposition; therefore, exchanges are subject to the public auction requirement. In our view, the issue is not so simple. The two constitutional provisions are not identical but rather

---

**2.** In the case of states admitted before Wyoming, the enabling acts were passed by Congress first, and then each individual state convened its constitutional convention and adopted its constitution.

contain different terms of uncertain meaning which are susceptible to incongruent interpretation. Neither provision mentions exchanges of school lands.

[¶ 29] The State of Wyoming, through the legislature and the board, the entity constitutionally charged with the responsibility of managing school lands, historically has not interpreted the constitution as requiring public auctions for the exchange of school lands. On the contrary, the legislature has specifically authorized exchanges of school lands for private lands of equal value, and the board has adopted regulations specifying the procedures to be followed to assure lands of equal value are obtained by the state in the course of these exchanges. Pursuant to these statutes and regulations, the state has accomplished the exchange of thousands of acres of school lands over the course of the last century.

[¶ 30] The statutes contain detailed and thorough procedures and requirements that must be followed before school lands can be exchanged, with the obvious purpose of assuring that the state and the permanent school fund receive fair value in return for any lands conveyed to a private party. Those statutes provide:

**§ 36–1–107. Exchange of state-owned and privately owned lands**

The state of Wyoming is also authorized to exchange state-owned lands for privately owned lands.

**§ 36–1–110. Authority of director to effect and complete exchanges**

The director is hereby authorized and empowered, subject to the approval of the state board of land commissioners, to effect and complete such exchange of state-owned lands for federal-owned lands; and also to effect and complete such exchange of state-owned lands for privately owned lands; and to do any and all things necessary or required to be done by the state of Wyoming in order to enable said state to comply with the provisions of said Taylor Grazing Act and other acts of congress authorizing the exchange of federal-owned lands, and any order, rule or regulation passed or promulgated in pursuance thereof; and to effect and complete the exchange of state-owned lands for privately-owned lands. The board of land commissioners may authorize the purchase of lands only in an amount necessary to effect and complete the exchange of state-owned lands for other lands and only for those lands identified in the authorization of purchase. The board shall not use the power of eminent domain pursuant to W.S. 1–26–801 et seq. to purchase any lands under this section.

**§ 36–1–111. Orders, rules and regulations relative to exchange of lands**

(a) The board of land commissioners is hereby authorized and empowered to pass and promulgate all such orders, rules and regulations as may be necessary or required relative to the appraisal and valuation of the lands to be exchanged as provided in this act, and to provide for the execution of conveyances, contracts and other instruments pertaining to the exchange of the lands, and to enable the director to effect and complete each exchange of the lands. The board may authorize the purchase of lands only in an amount necessary to effect and complete the exchange of state-owned lands for other lands and only for those lands identified in the authorization of purchase. The board shall not use the power of eminent domain pursuant to W.S. 1–26–801 et seq. to purchase any lands under this section. The board of land commissioners is authorized to promulgate rules and regulations necessary to implement the exchange of state lands on a value for value basis. The exchange program may authorize a cash equalization receipt or payment of up to twenty-five percent (25%) of the value of the lands exchanged. Any receipt shall be deposited into, and any payment shall be made from, the permanent land fund. State lands may be exchanged upon the board's finding the exchange is necessary to:

(i) Make state lands more manageable where the lands are not otherwise manageable;

(ii) Meet a specific need of a school or community for land;

(iii) Better meet the multiple use objectives for the benefit of the trust; or

(iv) Realize a clear long term benefit to the trust which substantially exceeds the present and probable future benefit from continued ownership.

[¶ 31] Pursuant to the authority granted by these statutes, the board adopted regulations authorizing exchanges of state lands pursuant to specific procedures. In a similar vein, these regulations provide detailed procedures for the exchange of school lands and require that any property acquired by the permanent fund be of equal or greater value than the property conveyed to the private party.[3]

## STANDARD OF REVIEW

[¶ 32] Critical to the resolution of this case is the fundamental maxim followed consistently by this Court since statehood that every statute is presumed constitutional and not to be held in conflict with the constitution unless such conclusion is clear, palpable, unavoidable, and beyond reasonable doubt. *Painter v. Abels*, 998 P.2d 931 (Wyo. 2000); *Wyoming Coalition v. Wyoming Game & Fish Commission*, 875 P.2d 729 (Wyo.1994); *Thomson v. Wyoming In-Stream Flow Committee*, 651 P.2d 778 (Wyo. 1982); *Uhls v. State ex rel. City of Cheyenne*, 429 P.2d 74 (Wyo.1967); *Taxpayers' League of Carbon County, Wyo. v. McPherson*, 49 Wyo. 251, 54 P.2d 897 (1936); *State v. Sureties of Krohne*, 4 Wyo. 347, 34 P. 3 (1893). A person challenging the constitutionality of a statute bears a heavy burden of proving such beyond any reasonable doubt. *Board of County Commissioners v. Geringer*, 941 P.2d 742 (Wyo.1997); *V–1 Oil Company v. State*, 934 P.2d 740 (Wyo.1997); *NJC v. State*, 913 P.2d 435 (Wyo.1996). In fact, we are duty bound to uphold statutes where possible and resolve all doubts in favor of constitutionality. *Campbell v. State*, 999 P.2d 649 (Wyo. 2000); *Frantz v. Campbell County Memorial Hospital*, 932 P.2d 750 (Wyo.1997). The challengers present a facial challenge, which is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

[¶ 33] In construing our constitution, we follow essentially the same rules as those governing the construction of a statute. The fundamental purpose of those rules of construction is to ascertain the intent of the framers. *Geringer v. Bebout*, 10 P.3d 514, 521 (Wyo.2000); *Zancanelli v. Central Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981, 991 (1918). "We are charged with discerning the intent of the Constitutional Convention, and we look first to the plain and unambiguous language to discern that intent." *Geringer*, 953 P.2d at 843.

[¶ 34] Looking to the plain language used by the framers with regard to the state's authority over lands granted to it for educational purposes, we find the language uncertain in meaning. Although Article 18, Section 1 of the Wyoming Constitution states that all such lands shall be "disposed of only at public auction," it also contains terms typically applicable to a sale, such as a minimum price per acre and a provision for "purchase" by a settler of land on which he had settled at the time the constitution was adopted. Restricting our analysis to that section, we might conclude the framers contemplated a sale as the only method of authorized "disposal" of school lands and such sale must occur at a public auction. Proceeding to Section 3 of that article, however, we see the framers granted very broad authority to the board over much more than simple sales of school lands by providing the board shall direct, control, lease, and dispose of the lands. That language connotes an intent to allow the board flexibility to manage the school lands while they remain in state ownership. Section 3 goes on to provide the board's authority is "subject to the further limitations that the *sale* of all lands shall be at public auction" (emphasis added) and "at

---

3. The questions reserved to this Court for resolution in Case No. 02–18 do not include issues of fact concerning whether the exchange in question complies with the standards for exchanges set forth in the applicable statutes and regulations, and, consequently, we make no conclusions in that regard.

such minimum prices (not less than the minimum fixed by congress) as to realize the largest possible proceeds." The framers' choice of different language in this section, as well as the inference in Section 1 that the disposal they contemplated was a sale, creates an unavoidable ambiguity with regard to whether the framers intended the board to have the authority to exchange school lands without a public auction. Is a sale the "disposal" contemplated by Section 1? That reading would be consistent with Section 3's use of the term "sale" when referring to the action that can only occur at public auction. Did the framers mean any transaction that resulted in an exchange of school lands for other lands of equal value must occur at public auction? What did the framers intend by giving the board authority over direction, control, and leasing in addition to "disposal"? None of these questions is answered by the plain language used by the framers. Consequently, we must resort to the rules of construction to glean their intent.

[¶ 35] As we have noted:

" 'In interpreting statutes, we primarily determine the legislature's intent. If the language is sufficiently clear, we do not resort to rules of construction. We apply our general rule that we look to the ordinary and obvious meaning of a statute when the language is unambiguous.' " *Thunderbasin Land, Livestock & Investment Co. v. County of Laramie County,* 5 P.3d 774, 779 (Wyo.2000) (quoting *Kirbens v. Wyoming State Board of Medicine,* 992 P.2d 1056, 1060 (Wyo.1999) (citations omitted)). We construe together all parts of the statutes in pari materia, and, in ascertaining the meaning of a given law, we consider and construe in harmony all statutes relating to the same subject or having the same general purpose. *Id.* "When the language is not clear or is ambiguous, the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent." *State ex rel. Motor Vehicle Division v. Holtz,* 674 P.2d 732, 736 (Wyo. 1983).

*Fosler v. Collins,* 13 P.3d 686, 688 (Wyo. 2000).

## DISCUSSION

[¶ 36] As we apply these rules of construction to the constitutional provisions in question to determine whether the statutes and regulations authorizing exchanges of school lands without public auction are constitutional, we look first to the historical context of the two provisions and the "mischief" they were intended to cure. In doing so, we note Article 18, Section 1 was contained in the original constitution adopted in 1890, while Article 18, Section 3, in its current form, resulted from a 1921 amendment by a different group of "framers" which combined the original Section 3 with Article 7, Section 13.

[¶ 37] Looking first to the original language, we have as guidance the records of the constitutional convention and the historical experience of other states as they were admitted into the Union. The federal government's policy of granting lands to states for the support of schools is traceable to the country's infancy and the adoption of the General Land Ordinance of 1785 and the Northwest Ordinance adopted two years later, both of which required certain lands to be granted for schools to new states joining the Union. Sally K. Fairfax et al., *School Trust Lands: A Fresh Look at Conventional Wisdom,* 22 Envtl. L. 797, 805–06 (1992). The general motivation for the grants was the concern that states in their infancy would not provide sufficient financial support of schools without federal assistance. *Id.* at 806 n. 24. However, exactly how the states were to use the lands to support the schools was not well defined. From the beginning, debate occurred over whether such lands should be sold or retained for future use. Many of the early states' constitutions actually provided for quick sales in order to spur economic development as well as provide immediate funds for the support of schools. *Id.* at 807. While much has been made about those early states having improperly man-

aged the lands granted, some authorities suggest their actions derived from a desire to achieve immediate benefit for the citizens rather than preserving the lands for the use of future generations. According to these authorities, suggestions by historians of incompetence or corruption have been overstated. *Id.*

[¶ 38] In any event, limitations on states' rights regarding the management and sale of school lands evolved over time. States imposed such limitations on themselves in their own constitutions, and, in some cases, the federal government imposed limitations in the respective enabling statutes. Subtle, but significant, variations in language exist between states as well as within the key documents enacted in a single state. *Id.* at 819. For example, Section 4 of Wyoming's Act of Admission granted lands "for the support of common schools" whereas Article 18, Section 1 of our constitution accepted the grants "for educational purposes," arguably a less restrictive limitation. Throughout the Nineteenth and early Twentieth Centuries, neither the state constitutions nor the federal enabling statutes explicitly addressed the states' authority to exchange school lands for other lands of equal value.

[¶ 39] While the general historical context is informative, our task is to interpret the Wyoming Constitution and the Act of Admission; therefore, we must focus our analysis on the unique history of those particular provisions. Unlike most states, Wyoming's constitutional convention was called before Congress enacted any enabling legislation. Robert B. Keiter & Tim Newcomb, The Wyoming State Constitution, A Reference Guide at 5 (1993), citing T.A. Larson, History of Wyoming at 244 (2d ed.1978). Consequently, the delegates had to assume Congress would grant Wyoming federal lands when it authorized statehood. They did not have the benefit of a specific grant with which they could conform their acceptance. *See generally* Keiter & Newcomb, *supra* at Foreword. Ultimately, Congress passed Wyoming's Act of Admission on July 10, 1890, eight months after the constitution was adopted, and, as expected, that act granted Wyoming various lands, some of which were dedicated for "support of common schools" and to be "disposed of only at public sale." Act of Admission at §§ 4, 5.

[¶ 40] The record of the debates during the constitutional convention sheds some light on the concerns of the delegates regarding the lands they anticipated would be granted by the federal government. These records "may very properly be resorted to as indicating somewhat the intent and object which caused the incorporation of disputed clauses into the fundamental law." *Grand Island & N.W.R. Co. v. Baker,* 6 Wyo. 369, 45 P. 494, 500 (1896); *see also Chicago & N.W. Ry. Co. v. Hall,* 46 Wyo. 380, 26 P.2d 1071 (1933). We learn from these debates the delegates used the terms "sale" and "disposal" interchangeably and did not address the concept of exchange of lands. 1889 Journal and Debates of the Constitutional Convention of the State of Wyoming at 749–52. They rejected a proposal to withhold the lands from sale to preserve their value for future generations. The discussion discloses a belief by some that the lands were not likely to garner the minimum $10 per acre price and, if they did, the state should act quickly to sell them. *Id.* at 752. We also learn from these records that, while the delegates agreed to require a public auction before these lands could be sold, some believed auctions could be manipulated and the further protection of an appraisal by the land commissioner should be required. *Id.* at 755–56. In what must be interpreted as a desire for flexibility and a willingness to rely on the land commissioner to assure a fair sales price, the delegates agreed to allow sales to occur so long as at least seventy-five percent of the appraised value was obtained. *Id.* at 753. Throughout the debates, the concern of the delegates was focused on how and when state lands could be sold. When those concerns were translated into the actual language of the relevant constitutional provisions, the terms "sale" and "disposal" seem to be used interchangeably. Article 18, Section 1, in which the State of Wyoming accepted the grant of lands by the federal government for "educational purposes," provided that such lands "shall be **disposed of** only at public auction" (emphasis added) at a minimum of $10 per acre, clearly a "sales price,"

and seventy-five percent of the appraised value. At the same time, delegates also adopted Article 7, Section 13, which required an auction before the "sale" of school lands. Reading the language of these two provisions together and in light of the contemporaneous comments of the delegates, we believe the only method of "disposal" contemplated was a sale. That conclusion is consistent with the language chosen by Wyoming's first legislature immediately following statehood that state lands could be "disposed of" at public auction after being "appraised" and "sold" for a minimum price of $10 per acre.

[¶ 41] The convention records, the constitutional language itself, and the first statutes are devoid of any mention of land exchanges. This situation is not unlike the experience in other states admitted into the Union in the same general time frame. In fact, the first mention we found of the general concept of exchanges of public lands appears in 1914 when the federal government amended the statute which created Yosemite National Park to specifically authorize land exchanges. 16 U.S.C. § 51 (1914). Despite this lack of specific authority for the exchange of state lands, within eighteen years of statehood, Wyoming's land commissioner proposed to relinquish certain school sections which were located within Indian reservations in exchange for acquiring equal area of indemnity land in lieu thereof. Second Biennial Report of Robert P. Fuller, Commissioner of Public Lands, Wyoming at 11 (1906–1908). That practice continued through the early 1900s resulting in numerous exchanges with the federal government and the overall enhancement of the value of the school lands. *See also* Third Biennial Report of the Commissioner of Public Lands of Wyoming (1910); Sixth Biennial Report of the Commissioner of Public Lands of Wyoming (1916). Without question, these exchanges with the federal government could not have occurred had a public auction been required before the particular parcel of school land could be conveyed. The active support of both the federal and state governments was necessary to accomplish these exchanges, and no indication exists in the historical record that either believed public auctions were a condition precedent to the exchanges.

[¶ 42] The constitution was amended in 1921 in this environment where exchanges were not specifically addressed in the constitution, yet the state and federal government were freely exchanging school lands. The amendment combined Article 18, Section 3 and Article 7, Section 13, which both provided for the creation of boards to manage lands granted to the state. Slight differences in the makeup and scope of authority of the two boards had led to confusion and duplication. The amendment created a new Article 18, Section 3, which combined the boards into a single "board of land commissioners," and applied the public auction requirement to the "sale" of all lands instead of only school lands. Senate Joint Resolution No. 2, Feb. 21, 1921, 1921 Wyo. Sess. Laws at 293. The authors of the 1921 amendment used the term "sale" and not the arguably broader term "disposal" to describe the transaction requiring a public auction. While it is difficult to make much of this subtle difference in language, it is indisputable that the land commissioner had exchanged thousands of acres with the federal government by the time of this amendment, and yet no attempt was made in the amendment process to require a public auction before an exchange could occur. Further evidence of the legislative branch's concurrence in exchanges without public auction was its adoption of statutes specifically allowing exchanges of school lands for both federal lands and private lands. *See* 1929 Wyo. Sess. Laws ch. 108, § 6 codified at Wyo. Stat. Ann. § 36–1–104 (LexisNexis 2001); 1935 Wyo. Sess. Laws ch. 76, § 1 codified at Wyo. Stat. Ann. § 36–1–106 (LexisNexis 2001); 1935 Wyo. Sess. Laws ch. 76, § 2 codified at Wyo. Stat. Ann. § 36–1–107 (LexisNexis 2001); 1935 Wyo. Sess. Laws ch. 76, § 4 codified at Wyo. Stat. Ann. § 36–1–111 (LexisNexis 2001). The later act allowed exchanges on a "value for value" basis after finding an exchange would:

(i) Make state lands more manageable where the lands are not otherwise manageable;

(ii) Meet a specific need of a school or community for land;

(iii) Better meet the multiple use objectives for the benefit of the trust; or

(iv) Realize a clear long term benefit to the trust which substantially exceeds the present and probable future benefit from continued ownership.

Section 36-1-111(a).

[¶ 43] In this same time frame, the federal Taylor Grazing Act, Act of June 28, 1934, ch. 865, 48 Stat. 1269 (codified at 43 U.S.C. §§ 315-316 (1934)), was enacted setting forth an explicit process for the exchange of federal lands and demonstrating a similar agreement by the federal government to the concept of exchanges of lands with the states. This statute apparently prompted the Wyoming legislature to pursue a constitutional amendment specifically authorizing the state to accept title to lands owned by the federal government in exchange for state lands of equal value. Senate Joint Resolution No. 5, Feb. 18, 1935, 1935 Wyo. Sess. Laws at 208. The voters failed to approve that amendment by a small margin. Wyoming Official Directory and Election Returns (1931-39). The challengers argue that failed attempt to amend the constitution supports their position that the constitution prohibits exchanges without public auction. While it is an accepted rule of statutory construction that rejection of a proposal by a governmental body is an indication of its intent, the rule cannot be applied automatically without first examining the failed proposal and the context in which it arose. A careful examination of the failed 1935 amendment does not support the conclusion urged by the challengers.

[¶ 44] The proposed amendment, by its own terms, was intended to facilitate exchanges authorized by the Taylor Grazing Act. Rejection of the amendment sheds little light on the constitution's preexisting provisions governing the "sale" of school lands or exchanges for private lands. Furthermore, the state's continued practice of freely exchanging state lands for both private and federal lands of equal value undermines the suggestion that anyone questioned at the time whether such exchanges without public auction were constitutional. The state's position was later supported by an attorney general's opinion concluding that the constitutional term "disposal" was intended to mean "sale" and a public auction was not required

for exchanges. Op. Att'y Gen. No. 110, Opinions of the Attorneys General of the State of Wyoming 624 (1953-1956).

[¶ 45] Assuming the framers' only intent was to restrict the legislature's options with regard to the sale of school lands and not other aspects of managing that resource, the state retained its inherent police power to maximize the value of the school lands it was responsible for managing. This is so because, as has long been recognized, the legislature may enact any law not expressly or inferentially prohibited by the constitution. *Witzenburger v. State ex rel. Wyoming Community Development Authority*, 575 P.2d 1100 (Wyo.1978).

[¶ 46] The early history of the state's exercise of its authority over school lands is important to our efforts to give meaning to the words of the framers because it was contemporaneous with the adoption of the constitution and, therefore, likely reflective of the mindset of the framers. *Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819 (1897). It is also significant that the state's assumption of authority, by both the legislative and executive branches, to exchange lands without public auction remained consistent and unquestioned for over a century and resulted in the exchange of thousands of acres of school lands with the purpose of enhancing the value of the school lands as a whole. Though the legislature's interpretation of the constitution is not binding on this Court, we would "be loath to interpret the constitution otherwise." *Geringer*, 10 P.3d at 522; *see also Coronado Oil Company v. Grieves*, 603 P.2d 406, 411 (Wyo.1979). Likewise, the executive branch's uniform interpretation that the constitution allows for exchanges without public auction deserves consideration. *People ex rel. Emerson v. Shawver*, 30 Wyo. 366, 222 P. 11 (1924). The attorney general's opinion supporting the executive branch's interpretation aids us and is entitled to some weight given the fact that state officials acted upon the opinion. *State ex rel. Burdick v. Schnitger*, 17 Wyo. 65, 96 P. 238 (1908).

[¶ 47] The challengers do not directly address this historical context and point instead to authorities which in other factual situa-

tions have interpreted the term "disposal" as meaning "to alienate" or "transfer" and the term "exchange" to mean "sale." While these authorities are instructive, they fall short of proving beyond a reasonable doubt what the framers meant when they selected those terms. For example, Black's Law Dictionary defines "dispose of" as "[t]o alienate or direct the ownership of property.... To exercise finally, in any manner, one's power of control over; to pass into the control of someone else; to ... relinquish, part with, or get rid of; ... to bargain away." Black's Law Dictionary 471 (6th ed.1990). Yet, as Black's Law Dictionary also points out, the term "dispose of" is "[o]ften used in [the] restricted sense of 'sale' only, or [is] so restricted by context." *Id.* In contrast to this restricted meaning and like the more general definitions contained in Black's Law Dictionary, several Wyoming cases have concluded "dispose" is a broad term signifying more than "sell." However, those cases involved entirely different factual settings and did not address the constitutional provisions in question here. *J.M. Carey & Brother v. City of Casper,* 66 Wyo. 437, 213 P.2d 263 (1950); *State ex rel. Cross v. Board of Land Commissioners,* 50 Wyo. 181, 62 P.2d 516 (1936). Interestingly, in interpreting the term "land" in *Cross,* this Court suggested the term could in some contexts mean everything above and below the surface as the appellant argued but would not have that same meaning in other contexts. "Reason and context play an important part in determining [a term's] true significance," this Court said. *State ex rel. Cross v. Board of Land Commissioners,* 50 Wyo. 181, 58 P.2d 423, 429, *reh'g denied,* 50 Wyo. 181, 62 P.2d 516 (1936).

[¶ 48] The challengers further argue *State v. Yellowstone Park Co.,* 57 Wyo. 502, 121 P.2d 170, 171 (1942), supports their position that "sale" includes exchanges because this Court stated a sale is "a contract between parties to give and to pass rights of property." That conclusion is inconsistent, however, with an earlier opinion much closer in time to the constitutional convention, *Cone v. Ivinson,* 4 Wyo. 203, 33 P. 31, 33 (1893), *aff'd,* 4 Wyo. 203, 35 P. 933 (1894), in which this Court stated, "The usual and ordinary definition of the word 'sale' is 'the transfer of the absolute or general property in a thing for a price in money.' Benj. Sales, § 1.'" Certainly, that definition would exclude an exchange.

[¶ 49] None of these authorities is very helpful in determining the intent of the framers. Certainly, "disposal" could include a sale, and an exchange could fit some definitions of "sale." However, given the situation facing the framers, the lack of any evidence they were even aware of the possibility of exchanges, and their desire to allow the land commissioner maximum flexibility while protecting the value of the school lands for the support of education, isolated definitions utilized by courts or dictionaries in dissimilar contexts are not particularly helpful or controlling.

[¶ 50] More instructive are the opinions of the few courts that have considered the issue in the context of lands granted to states for school purposes. Those courts have reached varying results, and their opinions must be examined individually as their respective results are necessarily dependent on each state's unique constitutional and statutory framework. The first of these cases is *Watson v. Caldwell,* 160 Fla. 398, 35 So.2d 125 (1948), which held the State of Florida could exchange school lands with lands from the federal government so the school lands could be included in Everglades National Park without violating a statutory requirement that all such lands be advertised and sold to the highest bidder. Florida did not have a constitutional requirement for public auction of school lands. However, the court had no difficulty differentiating between a sale of school lands and an exchange of such lands with the federal government for lands of equal value.

[¶ 51] In Colorado, the state's appellate court and the federal courts have addressed the issue and have, likewise, distinguished between sales and exchanges. The language in the Colorado Enabling Act, 18 Stat. 474, provided that school lands were to be "disposed of" only at public sale, created an explicit trust for the benefit of public schools, and required that the lands be managed in such a manner as would secure the maximum

possible amount for the school fund. *Branson School District RE–82*, 958 F.Supp. at 1506. Colorado adopted an extensive amendment, Amendment 16, to its constitution granting the state substantial flexibility in the management of school lands including expanding its management authority "in order to produce reasonable and consistent income over time." *Id.* at 1520. Several school districts and school children claimed the amendment would result in less money to the school lands fund and challenged the amendment in federal court contending it conflicted with Colorado's enabling act and the supremacy clause of the United States Constitution. *Id.* at 1501. Section 9(7) of Amendment 16 authorized the state to undertake "non-simultaneous exchanges of land." *Id.* at 1518. The court had no difficulty concluding nothing in that section "violates either the requisites of the Enabling Act or general trust principles." *Id.* Although it is not clear from the opinion, apparently the challengers were not even arguing that exchanges in general violated the enabling act's requirement for public auctions. Instead, they objected to exchanges where money from nonsimultaneous land exchanges was held in a separate account until the exchange was completed, claiming that violated Section 14 of the Colorado Enabling Act which required that such money be placed in the permanent school fund. The court characterized this argument as resting on "the premise that non-simultaneous land exchanges are really sales." *Id.* Disagreeing with that conclusion, the court held:

> I cannot agree. Deferred exchanges are common and acceptable transactions in real estate law and are not, as recognized by the IRS, sales or taxable events. *See* Internal Revenue Service Code § 1031; 26 U.S.C. § 1031. Accordingly, § 9(7)'s mechanism for allowing non-simultaneous land exchanges is not contrary to section 14 to the Enabling Act.
>
> In addition, exchanges of trust assets may be necessary to the prudent and effective management of a trust. 76 Am.Jur.2d Trusts § 433 (1990) (transfer of trust assets is common and may be necessary for reinvestment into more productive assets). Accordingly, so long as the exchanges are

performed to benefit the public schools, neither the Enabling Act nor common trust law prohibits non-simultaneous exchanges of land within the trust.

*Id.* at 1518–19.

[¶ 52] Implicit in the court's reasoning is the assumption that simple exchanges likewise are not violative of the enabling act's requirement that all "sales" be only at a public auction or sale. The Tenth Circuit Court of Appeals affirmed this decision and, while recognizing the Colorado Enabling Act's sole and exclusive method for "disposing of the school lands" was a " 'public sale' with a certain minimum price," upheld the amendment's provision "to facilitate land exchanges." *Branson School District Re–82 v. Romer*, 161 F.3d 619, 637–42 (10th Cir.1998). The court concluded that, so long as the interest from a nonsimultaneous land exchange was used for acquiring replacement lands which were themselves held in trust, the requirements of the enabling act were met. A fair reading of these cases discloses no suggestion by either the litigants or the courts that land exchanges are subject to the requirement of Colorado's enabling act that school lands be "disposed" of through a public auction.

[¶ 53] Following the *Branson* cases, the Colorado Court of Appeals considered a transaction involving school lands and concluded it constituted a sale, not an exchange, and was void for failure to comply with a Colorado statute which governed sales. *East Lake Creek Ranch, LLP v. Brotman*, 998 P.2d 46 (Colo.Ct.App.1999), *rev'd on other grounds*, 31 P.3d 886 (2001). The facts of that case were clearly determinative of the outcome and suggest that a pure exchange transaction would not have been considered by the court to be a "sale." In a nonsimultaneous exchange, the state granted the school lands to a private party before the corresponding private lands were identified and with no time limit in place for when that exchange was to occur. In addition, the state and the private party had agreed upon an appraised price for the school lands, and, when the private party deposited that amount with the state, he received the state patent. The court held the test for deter-

mining whether the transaction was an exchange or a sale was whether there was a fixed value for the exchange; if there was, the court held, it was a sale. *Id.* at 50. However, the court also stated:

> Admittedly, the mere fact that a price is placed on the properties involved in an exchange does not render the transaction a sale where the price fixed is evidently for the purpose of constituting a basis on which the exchange may be made. However, where the price is determined for the purpose of fixing definitely the value of the respective properties involved in the purported exchange, that determination is conclusive that a sale, not an exchange, has occurred. 33 C.J.S. Exchange of Property 2(b) (1998); *see Higbie v. Johnson,* 626 P.2d 1147 (Colo.App.1980); *see also Hamburger v. Berman,* 203 Mich. 78, 168 N.W. 925 (1918) (contract held to be exchange of two properties where values fixed by the respective parties upon the properties were mere estimates and were merely for the purposes of effecting an exchange).

*Id.* The entire thrust of the *East Lake Creek Ranch* opinion is the court's recognition that, in the context of state school lands, sales and exchanges are distinct and mutually exclusive. This holding is consistent with the decision in *Sorenson v. Regional Transportation District,* 745 P.2d 1047, 1049 (Colo.Ct. App.1987), where the Colorado Court of Appeals held the transfer of property from the State Board of Land Commissioners to RTD in exchange for RTD land of equivalent value was not a "sale" of the property. Consequently, if true exchanges are involved, it appears the Colorado courts would agree that the public sale provisions of the Colorado statutes do not apply.

[¶ 54] The only case involving school lands where the court concluded an exchange without the public auction required for sales was prohibited is *Fain Land & Cattle Company v. Hassell,* 163 Ariz. 587, 790 P.2d 242 (1990) (en banc). The Arizona Supreme Court held that a proposed exchange of school lands constituted a sale and, without a public auction, violated the state's constitution. One justice, concurring with the result but for different reasons, explicitly concluded sales and exchanges were clearly different and the transaction proposed was an exchange. However, the justice concluded, because the constitution did not specifically grant the state authority to exchange lands, the proposed exchange must fail. 163 Ariz. at 598, 790 P.2d at 253 (Corcoran, J., concurring in part).

[¶ 55] Arizona's unique constitutional and historical context prevents the *Fain* holding from controlling the result in Wyoming. The Arizona–New Mexico Enabling Act, adopted in 1910, twenty years after Wyoming's Act of Admission, imposed vastly different and far more restrictive limitations on the state with regard to the administration of its school lands. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557. The statute provided the state

> may only sell or lease trust land to the highest bidder at public auction after public notice. Enabling Act § 28. No sale or other disposal may be made unless the land is first appraised for its "true value," and the state receives consideration equal to, or greater than, the appraised value. In addition, the Enabling Act provides that any disposition of trust land not in substantial conformity with its provisions is "null and void." . . .
>
> The Enabling Act required that the state and its people consent to all its provisions concerning lands granted to the state and that an ordinance be included in the state constitution "in such terms as shall positively preclude the making of any future constitutional amendment or any change or abrogation of the said ordinance in whole or in part without the consent of Congress." Enabling Act § 20.

*Fain,* 163 Ariz. at 589, 790 P.2d at 244 (some citations omitted). Pursuant to this more restrictive enabling act, Arizona adopted detailed and restrictive constitutional provisions including, by reference, all the terms of the enabling act itself. Later, in response to the passage of the Taylor Grazing Act, Congress amended the Arizona–New Mexico Enabling Act to specify the state was authorized to exchange school lands. Act of June 5, 1936, ch. 517, 49 Stat. 1477; *Fain,* 163 Ariz. at 590, 790 P.2d at 245. However, Arizona rejected

a constitutional amendment which would have specifically authorized exchanges. *Fain,* 163 Ariz. at 590, 790 P.2d at 245. On the basis of that history, the Arizona Supreme Court held "the Enabling Act provides a minimum level of protection for trust land, while our state constitution goes much further" and "the express provisions of article 10 prohibit methods of disposal not enumerated in *our* constitution." *Id.* at 591, 790 P.2d at 246. In reliance, in part, on this authority, the court in *Fain* applied, in our view, an overly restrictive definition of "exchange" as any transaction with a fixed value, including an exchange "based on its appraised monetary value." *Id.* at 592, 790 P.2d at 247. However, the concurring opinion rejected this logic and concluded that an appraisal establishing a monetary value did not transform the exchange transaction into a sale. Citing to the Florida case of *Watson,* 160 Fla. 398, 35 So.2d 125, the concurrence concluded the sale/exchange debate was mere semantics and the reason the proposed exchange must fail was because exchanges were not explicitly authorized by the terms of the Arizona Constitution. *Id.* at 598, 790 P.2d at 253 (Corcoran, J., concurring in part). We believe that this conclusion is inconsistent with Wyoming law which provides the constitution is a limitation—not a grant—of authority. The omission of specific reference to exchanges in our constitution does not prohibit the state from entering into such transactions in the course of exercising its general police power.[4] The concurring opinion in *Fain* also rejected the conclusion that an exchange is a sale because it would lead to the "absurd result" that a public auction is required, an outcome which would be impossible to implement. Moreover, the concurrence concluded, "An exchange by public auction is an oxymoron, certainly not within the intentions of the framers of either the 1910 Enabling Act or our constitution." *Id.* at 600, 790 P.2d at 255 (Corcoran, J., concurring in part).

[¶ 56] The dissenting opinion in *Fain* disagreed with the majority's logic that, simply because a value is assigned to one or all the properties, a sale occurs. The dissent carefully examined the authorities cited by the majority in support of that proposition and concluded they involved different facts and none addressed the exchange of public land for private land. It found, "A sale and an exchange are two different concepts with different legal significance attached to each; otherwise, the words would be synonyms for each other with no legal difference." *Id.* at 606, 790 P.2d at 261 (Cameron, J., dissenting). We find the rationale of the *Fain* dissent more persuasive than the majority when considering what Wyoming's framers intended when they required a public auction for a sale of school lands.

[¶ 57] The challengers' contention that "disposal" must be read so broadly as to include any means of conveying the state's interest in school lands does not square with other authorities which have approved of grants of rights of way in school lands, condemnation of school lands, and use of school lands by other public and nonschool entities, all without public auction so long as the respective school lands fund receives full value for the interest granted. For example, the United States Supreme Court held public sale provisions of the Arizona–New Mexico Enabling Act did not apply to the state highway department's acquisition of rights of way and material sites on school lands. However, the court further held the state could not presume the value of the school lands was enhanced by the highway department's activities and was required to fully compensate the trust fund for the value of the interests acquired. *Lassen v. Arizona ex rel. Arizona Highway Department,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). After considering the historical context of the enabling act and concluding the purpose of the public sale requirement was to prevent school lands from being "exploited for private advantage," the court saw "no need to read the Act to impose these restrictions on transfers in which the abuses they were intended to prevent are not likely to occur, and in which the trust may in another and more effective fash-

---

4. The concurring opinion also rejects the argument that "other disposal" includes sales relying on provisions of the Arizona Constitution.

ion be assured full compensation." *Id.* at 464, 87 S.Ct. 584. The holding in *Lassen,* which can be applied with equal force to exchanges, stated:

> We conclude that it is consonant with the Act's essential purposes to exclude from the restrictions in question the transactions at issue here. The trust will be protected, and its purposes entirely satisfied, if the State is required to provide full compensation for the land it uses. We hold, therefore, that Arizona need not offer public notice or conduct a public sale when it seeks trust lands for its highway program. The State may instead employ the procedures established by the Commissioner's rules, or any other procedures reasonably calculated to assure the integrity of the trust and to prevent misapplication of its lands and funds.

*Id.* at 465, 87 S.Ct. 584.

[¶ 58] The Wyoming Supreme Court approved similar logic in *Ross v. Trustees of University of Wyoming,* 30 Wyo. 433, 222 P. 3 (1924), where we concluded condemnation of a right of way across lands owned by the university did not violate the constitutional requirement for a public auction for "disposition" of school lands. Relying on the fact that the rights of way for public roads improved the value of the remaining school lands, a concept equally applicable to land exchanges, this Court concluded the power to establish public highways "is neither dependent upon, nor limited by, the provisions with respect to the sale and *disposition* of said lands. The impracticability of creating an easement for a public road by means of a public auction is too obvious to require comment." 222 P. at 6 (emphasis added); *see also United States v. Fuller,* 20 F.Supp. 839 (D.Idaho 1937).

[¶ 59] Considering all the foregoing, we cannot conclude, beyond a reasonable doubt, that the framers of the constitution intended a public auction must occur before the state can exchange school lands for lands of equal value. This holding is necessarily specific to

our constitution and mandated by our precedent dating back to territorial days, which requires any finding of unconstitutionality to be proven beyond a reasonable doubt. As this Court said in *Wagner v. Harris,* 1 Wyo. 194, 201–02 (1875):

> [T]hat the passage of the charter was unwise and impolitic we are not called upon to decide. The courts will not declare a law or any portion of a law unconstitutional unless its opposition to the fundamental law is clear and plain. To justify a court in pronouncing an act of the legislature to be unconstitutional the incompatibility must not be speculative, argumentative, or to be found only in hypothetical cases or in supposed consequences; it must be clear, decided and inevitable, such as presents a contradiction at once to the mind, without straining either by forced meanings or too remote consequences: [32 U.S. 633, 8 L.Ed. 810] 7 *Peters* 633; 2 *McLane* 195.

[¶ 60] We recognize the logical appeal of the challengers' contention that the terms used in the constitution can be read to suggest a public auction is required. However, that is not the test. We are asked to hold that the statutes specifically authorizing exchanges without public auction violate the constitution. We cannot do so if there is any reasonable doubt the framers did not intend that result. Based on the foregoing discussion, we conclude such doubt is patent.

### Exchanges as a Violation of the State's Fiduciary Duty

[¶ 61] In addition to arguing that the constitution, by its explicit terms, requires treatment of exchanges of school lands as sales, the challengers contend the state holds these lands in trust and imply exchanges without public auction violate that trust. Without specific explanation or authority, their argument suggests that exchanges without public auction somehow violate a trustee's fiduciary duties.[5] We recently held Wyoming school lands are not subject to a constitutionally created trust or

---

5. In their briefs discussing the trust issue, Merbanco and WEA cite to cases which hold states must fully compensate the school lands fund for any lands taken for rights of way or other general public uses because they hold those lands in

trust. However, they cite no authority for the proposition that a value for value exchange is somehow violative of the fiduciary duty of a trustee.

one created by the Act of Admission. *Riedel v. Anderson*, 2003 WY 70, 70 P.3d 223. However, we found the legislature acted within its authority to create a statutory trust. *Id.* at ¶ 34; Wyo. Stat. Ann. § 36–5–105 (LexisNexis 2001). The challengers make no argument that land exchanges violate any aspect of the statutory requirements which establish the terms of that statutory trust. We also observe the challengers provide no authority to support the proposition that exchanges per se would violate a trustee's fiduciary duty to the beneficiaries of a trust, should one exist. Given the statutory criteria for exchanges, one could persuasively argue that exchanges which meet those criteria are necessarily in the interest of the beneficiaries of the school lands fund. Section 36–1–111(a).

## CONCLUSION

[¶ 62] The constitution prohibits the *sale* of school lands without a public auction. However, the framers did not include a specific prohibition against the *exchange* of school lands without a public auction. We will not read such a requirement into the constitution and, therefore, conclude the statutes and regulations authorizing the exchange of school lands do not violate the constitution. In the absence of a clear constitutional prohibition of exchanges without auction, the legislature properly exercised its power to adopt statutes which specify the circumstances in which such exchanges are allowed and authorized the adoption of administrative regulations regarding the same. We affirm the district court's denial of the state's motion to dismiss in Case No. 01–261 and answer the reserved questions in Case No. 02–18 "no."